1
2
3
4
5

Diana M. Torres (S.B.N. 162284)
diana.torres@kirkland.com
Allison W. Buchner (S.B.N. 253102)
allison.buchner@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California  90071
Telephone:   (213) 680-8400
Facsimile:    (213) 680-8500

6
7
8
9

Dale Cendali, *pro hac vice*
dale.cendali@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:   (212) 446-4800
Facsimile:    (212) 446-4900

10
11

Attorneys for Defendant
FGF BRANDS, INC.

12

## UNITED STATES DISTRICT COURT

13

## CENTRAL DISTRICT OF CALIFORNIA

14

## WESTERN DIVISION

STONEFIRE GRILL, INC.,
 a California corporation,

            Plaintiff,

      vs.

FGF BRANDS, INC., a Canadian
corporation, doing business as
STONEFIRE AUTHENTIC
FLATBREADS,

            Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. CV 11-8292-JGB (PJWx)

**DEFENDANT FGF BRANDS,
INC.'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT**

**[PUBLIC VERSION]**

Date:    July 15, 2013
Time:   9:00 a.m.
Room:  Riverside-Courtroom 1

**Hon. Jesus G. Bernal**

# **TABLE OF CONTENTS**

**Page**

I.   **Introduction** ................................................................................1

II.  **Factual Background** .....................................................................3

   A.    FGF and Its Stonefire Authentic Flatbreads.............................3

   B.    Plaintiff's Southern California Restaurant Chain and Its Marks ..........4

   C.    Plaintiff's "Plans to Expand" ..................................................6

   D.    Plaintiff's Licensing Program Façade and Failure to Police Its Marks ................................................................................8

   E.    Plaintiff's Claim of Confusion Is Supported Only By Anecdotal Stories from Friends and Family A Handful of Post-Suit Emails ......10

   F.    FGF's Marketing Survey Shows No Likelihood of Confusion ..........11

   G.    Plaintiff Seeks To Disgorge All of FGF's Revenues ..........................12

   H.    Plaintiff's Claim of Willfulness ...............................................12

III. **Legal Standard** ..........................................................................**12**

IV.  **FGF Is Entitled To Summary Judgment On Each Claim** .......................**13**

   A.    Plaintiff Cannot Show The Requisite Likelihood of Confusion..........13

       1.    Plaintiff's Marks Are Not Strong...............................................14

       2.    Flatbreads Are Not Closely Related to Restaurants .................15

       3.    The Marks Are Not Similar .......................................................16

       4.    Plaintiff's Evidence of Supposed Confusion is Legally Insufficient ................................................................................17

       5.    The Parties' Marketing Channels are Distinct..........................20

       6.    Degree of Consumer Care..........................................................20

       7.    Defendant Proceeded With Good Faith at All Times...............21

       8.    Plaintiff Has No Evidence of Its Supposed Plans to Expand ...21

   B.    Plaintiff Has Abandoned Any Rights In Its Marks Through Its Naked Licensing and Sham Efforts to Police .......................................22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF CONTENTS (CONT'D)</u>

<u>Page</u>

V.     Plaintiff's Mark is Void *Ab Initio* Because It Had Not Been Used In
       Interstate Commerce When Registered ......................................................**24**

VI.    Plaintiff Is Not Entitled To Disgorge Profits..............................................**24**

VII.   Conclusion ...................................................................................................**25**

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adray v. Adry-Mart, Inc.,*
76 F.3d 984 (9th Cir. 1995) ...............................................................25

*AMF Inc. v. Sleekcraft Boats,*
599 F.2d 341 (9th Cir. 1979) ...............................................14, 20, 22

*Amstar Corp. v. Domino's Pizza, Inc.,*
615 F.2d 252 (5th Cir. 1980) ...............................................................16

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ...............................................................12, 13

*Anheuser-Busch, Inc. v. Caught-on-Bleu, Inc.,*
288 F. Supp. 2d 105 (D.N.H. 2003), *aff'd,* 105 F. App'x 285 (1st Cir. 2004)..........18

*Aycock Eng'g, Inc. v. Airflite, Inc.,*
560 F.3d 1350 (Fed. Cir. 2009) ...............................................................24

*Barcamerica Int'l. USA Trust v. Tyfield Imps., Inc.*
289 F.3d 589 (9th Cir. 2002) ...............................................2, 22, 23

*Cairns v. Franklin Mint Co.,*
24 F. Supp. 2d 1013 (C.D. Cal. 1998) ...............................................17, 18, 19

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ...............................................................13, 14

*Cohn v. Petsmart, Inc.,*
281 F.3d 837 (9th Cir. 2002) ...............................................................18, 22

*Dan Tana v. Dantanna's,*
611 F.3d 767 (11th Cir. 2010) ...............................................16, 18, 22

*Echo Drain v. Newsted,*
307 F. Supp. 2d 1116 (C.D. Cal. 2003) ...............................................13, 15, 18, 19

*FreecycleSunnyvale v. Freecycle Network,*
626 F.3d 509 (9th Cir. 2010) ...............................................................23

*Glow Indus., Inc. v. Lopez,*
252 F. Supp. 2d 962 (C.D. Cal. 2002) ...............................................15, 16

*In re Coors Brewing Co.,*
343 F.3d 1340 (Fed. Cir. 2003) ...............................................................16

*James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.,*
No. SACV-11-1309-DOC, 2013 WL 655314 (C.D. Cal. Feb. 21, 2013) .....17, 19, 22

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Lindy Pen Co., Inc. v. Bic Pen Corp.*,
982 F.2d 1400 (9th Cir. 1993) ...................................................................25

*M2 Software, Inc. v. Madacy Entm't*,
421 F.3d 1073 (9th Cir. 2005) ..............................................13, 14, 21, 22

*Machine Head v. Dewey Global Holdings, Inc.*,
2001 U.S. Dist. Lexis 22759, *28, 61 U.S.P.Q.2d 13B (N.D. Cal. Dec. 13, 2001)..19

*Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*,
290 F. Supp. 2d 1083 (C.D. Cal. 2003) .......................................14, 15, 22

*Nordstrom Inc. v. NoMoreRack Retail Group, Inc.*,
No. C12-1853-RSM, 2013 WL 1196948 (W.D. Wash. Mar. 25, 2013) .............19, 20

*Nutri/System, Inc. v. Con-Stan Indus., Inc.*,
809 F.2d 601 (9th Cir. 1987) ...................................................................20

*Official Airline Guides v. Goss*,
6 F.3d 1385 (9th Cir. 1993) .............................................................16, 21

*One Indus., LLC v. Jim O'Neal Distrib., Inc.*,
578 F.3d 1154 (9th Cir. 2009) ...................................................................14

*Oyster Software, Inc. v. Forms Processing, Inc.*,
No. 00 Civ. 724, 2001 WL 1736382 (N.D. Cal. Dec. 6, 2001) ...................18

*Summers v. Teichert & Son, Inc.*,
127 F.3d 1150 (9th Cir. 1997) ...................................................................13

*Surfvivor Media, Inc. v. Surfivor Prods.*,
406 F.3d 625 (9th Cir. 2005) .............................................................passim

*Truckstops Corp. of Am. v. C-Poultry Co. Ltd.*,
596 F. Supp. 1094 (M.D. Tenn. 1983).................................................16, 20

*Walter v. Mattel, Inc.*,
210 F.3d 1108 (9th Cir. 2000) ...................................................................19

*Whirlpool Props., Inc. v. LG Elecs. U.S.A., Inc.*,
No. 1:03-CV-414, 2006 WL 62846 (W.D. Mich. Jan. 10, 2006)...............18

## STATUTES

15 U.S.C. § 1127 ....................................................................................22, 24

Cal. Bus. & Prof. Code § 14202 ............................................................22, 24

Fed. R. Civ. P. 56(a)....................................................................................12

iv

1

## <u>TABLE OF AUTHORITIES (CONT'D)</u>

2

<u>Page(s)</u>

3

## <u>OTHER AUTHORITIES</u>

4

Trademark Manual of Examining Procedure § 901 .....................................................24

5

## <u>TREATISES</u>

6

*McCarthy on Trademarks*, § 23:14..............................................................................18

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.   INTRODUCTION

Cases like this, devoid of factual support, are the type that summary judgment is designed to resolve.  Defendant FGF Brands, Inc. ("FGF") is a family owned business that sells Naan and other flatbreads under the "Stonefire Authentic Flatbreads" name to supermarkets across the U.S. and Canada.  FGF holds a federal registration for the trademark "Stonefire" for flatbreads.  Plaintiff operates seven Southern California "fast casual" restaurants under the name "Stonefire Grill," using an entirely different logo.  Plaintiff has never sold any products to supermarkets, let alone flatbreads.  While Plaintiff has trademark registrations for the mark "Stonefire Grill," those registrations are for restaurant and bar services, not flatbreads sold to supermarkets.  The United States Patent and Trademark Office ("PTO") issued both parties' registrations because it believed that the marks and uses could co-exist without a likelihood of confusion.  This Court should reach the same conclusion.  The only reason this case has been brought is that Plaintiff (which admits that it has suffered *no* loss) is hoping to obtain the windfall of FGF's hard-earned profits.  But Plaintiff is not entitled to such a windfall as it cannot show a likelihood of confusion -- the *sine qua non* of *all of its claims* -- nor can it show that FGF acted willfully, as it must to recover profits in this case.  In fact, as detailed below, Plaintiff cannot even show that it owns a protectable mark because it engaged in a sham policing and licensing scheme to help it in this litigation, which, by law, results in a forfeiture of its rights.

*First,* each of Plaintiff's claims fails because Plaintiff cannot prove a likelihood of confusion.[1]  Plaintiff disclosed no survey but relies solely on a handful of hearsay statements, mostly from friends and family, conveniently made well after the filing of this lawsuit.  Such *de minimus* confusion is legally insufficient under well-established law to show that a substantial portion of the consuming public is likely to be confused.

---

[1] Plaintiff alleges trademark infringement and unfair competition under federal and California law and false designation of origin under federal law and further seeks cancellation of FGF's "Stonefire" mark on the basis that it is likely to cause confusion with Plaintiff's "Stonefire Grill" mark.  (Dkt. 31-1.) Plaintiff's inability to show a likelihood of confusion is fatal to each of its claims.

1   FGF, in contrast, retained a renowned survey expert, Dr. Gerald Ford, whose survey

2   showed no likelihood of confusion -- not surprising where parties use different marks

3   in different businesses.

4       Faced with those facts, Plaintiff contends that the sale of bread in retail markets

5   (the business of FGF) is within Plaintiff's "natural zone of expansion," and thus it

6   should be afforded protection in that area, even though Plaintiff never sought to

7   register any of its marks in that class of goods or took any real steps to enter that

8   business.  The law is clear, though, that to receive protection in a supposed "natural

9   zone of expansion," a party must show evidence of actual, concrete steps taken to

10  further those plans of expansion -- mere aspirations of expanding are not enough.

11      *Second*, Plaintiff's claims fail for the independent reason that, as a matter of

12  law, Plaintiff has abandoned all rights in its "Stonefire Grill" marks through its naked

13  licensing and sham efforts to police third-party use.  Under binding precedent, a

14  trademark owner engages in "naked licensing" when it grants a license but fails to

15  exercise adequate quality control over its licensee.  Indeed, in the Ninth Circuit, naked

16  licensing "constitutes *abandonment of any rights to the trademark*."  *Barcamerica*

17  *Int'l. USA Trust v. Tyfield Imps., Inc.*, 289 F.3d 589, 598 (9th Cir. 2002) (emphasis

18  added).  And the uncontroverted facts in this case demonstrate that Plaintiff embarked

19  on a campaign to create the appearance of policing its mark and, in the process, issued

20  precisely the type of naked license that results in a loss of all rights to enforce its

21  marks.  On this independent basis as well, FGF is entitled to summary judgment.

22      *Third*, even if Plaintiff could overcome both of the above hurdles, its federal

23  "Stonefire Grill" word mark is void *ab initio* because Plaintiff was not using the mark

24  in *interstate* commerce at the time of its registration, a basic prerequisite to obtaining

25  a valid mark.  Although Plaintiff represented in its application that it was using the

26  mark in interstate commerce *at least as early as December 1, 2002*, Plaintiff's

27  corporate representative admitted that Plaintiff was *not conducting any business*

28  *outside of California at least through 2004*.  (Statement of Undisputed Facts ("SUF")

2

48, 56-58.)  Plaintiff's failure to use its federal mark in interstate commerce prior to the mark's registration renders the mark void *ab initio*, and subject to cancellation. Plaintiff also proffers no evidence of interstate commerce use prior to its subsequent registrations in 2009, which renders those registrations subject to cancellation as well.

*Finally*, even if Plaintiff could overcome the significant hurdles to showing *liability*, Plaintiff is not entitled to the windfall of damages it seeks.  Plaintiff has admitted that it has not suffered *any loss whatsoever* as a result of FGF's sale of its Stonefire Authentic Flatbreads.  Faced with that fact, the only remedy that Plaintiff seeks here is an accounting of FGF's profits, which requires Plaintiff to show that FGF's alleged infringement was done with the intent to deceive consumers and to exploit some advantage from Plaintiff's marks.  Plaintiff has no evidence to make such a showing, and indeed, the undisputed evidence is to the contrary.  FGF is thus entitled to a summary adjudication that Plaintiff may not recover FGF's profits.

FGF respectfully asks the Court to grant this motion and end this shakedown.

## II.   FACTUAL BACKGROUND

### A.   FGF and Its Stonefire Authentic Flatbreads

FGF is a family-owned business, founded in 2004 by Sam Ajmera and his sons, Ojus and Tejus, to provide high-quality, authentic baked goods.  SUF 2.  In March 2011, FGF launched its Stonefire Authentic Flatbreads product line, which includes Naan, Pita, Roti, and, more recently, pizza crust.  SUF 19.  These breads, formerly sold under the brand name "Fabulous Flats," are available in roughly twenty-two thousand grocery and large retail outlets across the U.S. and Canada.  SUF 20.

In July 2009, FGF embarked on a rebranding process and engaged the services of Lexicon Branding, an internationally-recognized branding agency, to generate a list of possible brand names.  SUF 5.  Over the next several months, Lexicon (which uses its own in-house trademark counsel to pre-clear suggested names) devised a list of potential brand names, researched their availability, and provided a list of names. SUF 6-7.  FGF narrowed the list and hired an experienced ethnographer to conduct

focus groups to gauge consumer response to the potential brand names on the narrowed list. SUF 8. Notably, not a single participant in those focus groups mentioned Plaintiff or any other restaurant with "Stonefire" in its name. SUF 9.

FGF also hired well-qualified trademark counsel to confirm that the "Stonefire" mark was available. SUF 10-11. The trademark search report, like subsequent Internet searches, revealed several restaurants using the name "Stonefire" including (without limitation) restaurants located in New Jersey, Michigan, and California, but no registrations for the "Stonefire" mark in International Class 30 (FGF's relevant class). SUF 13, 15. The report also listed Plaintiff's "Stonefire Grill" and "Stonefire Grill A Fresh Approach to Family Dining!" federal trademark registrations for use in connection with *restaurant and bar services* (Int'l Class 43). SUF 12. At the end of this process, FGF chose the Stonefire brand name.[2] SUF 17. FGF also applied for and was granted a federal trademark registration (Reg. No. 4,020,583) for the "Stonefire" mark *in connection with flatbreads* (International Class 30), which issued on August 30, 2011. SUF 17. Plaintiff did not oppose FGF's registration. SUF 18.

FGF's Stonefire Authentic Flatbreads, launched in March 2011, have gained widespread recognition. SUF 19, 22-26. FGF's Stonefire Authentic Flatbreads have been featured on the popular cooking show *Hell's Kitchen* and in *Everyday with Rachael Ray* and *Women's Health* magazines. SUF 22-23, 26. FGF also won a Whole Foods Market Supplier Award for Excellence in Product Quality. SUF 25. Not surprisingly, none of those media have confused FGF's Stonefire Authentic Flatbreads with Plaintiff or its restaurants, nor have any of FGF's Stonefire Authentic Flatbreads' nearly 15,000 social media fans ever indicated any confusion between FGF's products and any restaurant using the "Stonefire" name. SUF 29-30.

**B.    Plaintiff's Southern California Restaurant Chain and Its Marks**

Plaintiff's operations began in 2000 with a single restaurant, Wildfire Grill,

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ SUF 27-28.

which was owned by Wildfire Grill, Inc.  SUF 37-38.  In November 2002, Wildfire Grill, Inc. applied to register the mark "Stonefire Grill," alleging a bona fide intention to use the mark in commerce.  SUF 43, 47.  At that time, Wildfire Grill's sole location was in Valencia, California.  SUF 44-45.  In December 2002, Wildfire Grill changed the name of its restaurant to Stonefire Grill, but its corporate name remained the same. SUF 38-39, 45.  On May 13, 2004, Wildfire Grill, Inc. filed its Statement of Use with the PTO, and was issued the registration (now owned by Plaintiff) on August 31, 2004.  SUF 48, 50, 209.  Wildfire Grill, Inc.'s name changed to Stonefire Grill 1, Inc. in October 2004.[3]  SUF 39.  Until then, all corporate activities of the Stonefire Grill restaurant business were conducted by Wildfire Grill, Inc.  SUF 42.  Plaintiff's other two federal marks asserted in this action (Reg. No. 3,716,355 for the mark "Stonefire Grill A Fresh Approach for Family Dining!" and Reg. No. 3,716,351 for the "Stonefire Grill" words and design) issued in 2009.  SUF 51-52.  Plaintiff's marks are registered only for use in Class 43 and only for *restaurant and bar services*, and Plaintiff has never sought to register its marks in any other class.  SUF 50-52, 54-55.[4]

Plaintiff now has seven "fast casual" restaurants using the Stonefire Grill name. Each of those restaurants lies within a three-county area in Southern California.  SUF 31.  Plaintiff has never operated any restaurant outside this local geographic area. SUF 32.  When asked to state all facts showing that it first used its marks in commerce as early as December 1, 2002, Plaintiff responded as follows:

> In or around December 2002, Plaintiff, then a single-location restaurant in Valencia, CA, changed its name from "Wildfire Grill" to "Stonefire Grill."  Plaintiff also began offering catering services in connection with the "Stonefire Grill" marks in December, 2002.  Plaintiff has since expanded its restaurant/catering services to seven total locations. Plaintiff also offers its goods/services in connection with its "Stonefire Grill" through its offering for sale of gift-cards on its website, www.stonefiregrill.com.  Additionally, Plaintiff sells a la carte items to "Sky High Sports" locations in West Hills, Valencia, and Camarillo to large groups and walk-in guests to such locations.  SUF 215 (Pl.'s Resp. to Interrog. No. 21).)

---

[3] Plaintiff came into existence on October 6, 2004.  SUF 40.

[4] Plaintiff's California Registrations (Nos. 64925, 65097, and 65100), also asserted in this action, are also registered only for use in connection with restaurant and bar services.  SUF 54.

The only actions that arguably involve interstate commerce, however, occurred *after* the Plaintiff's May 2004 filing of its Statement of Use with the PTO. Indeed, when asked whether it conducted any business outside of California in 2002, Plaintiff's corporate representative admitted that "[c]onsidering that our restaurants are four walls based in southern California, no." SUF 56. Plaintiff did not conduct business outside of California using the Stonefire mark in 2003 or 2004 either, except for an alleged "influx of people from outside of California that could be eating [at their two restaurants]," of which Plaintiff has no record. SUF 57-59. Nor has Plaintiff ever provided any catering services outside of California. SUF 60. Plaintiff also engaged in virtually no advertising or marketing prior to 2010, and has no traditional media presence outside its limited geographic area. SUF 64-68. Plaintiff knows of no money it spent on advertising that reached an audience outside of California from 2002 through 2004.[5] SUF 69. Plaintiff did not start selling gift cards online until 2010. SUF 71. And, in a telling admission, Marketing Director Justin Lopez testified that Plaintiff's competitors "depend on geography" because "each [restaurant's] geography is specific and thus the competition is specific." SUF 73. Notably, Plaintiff has never had a restaurant close to the state line. SUF 74.

### C.   Plaintiff's "Plans to Expand"

Despite Plaintiff's very limited geographic reach, Plaintiff claims to have plans to expand across state lines and into grocery stores nationwide. SUF 75. Indeed, in its discovery responses, Plaintiff stated that it has "immediate plans on opening restaurant locations in Northern California and the southwestern U.S.," "to eventually expand throughout the U.S.," and "*potentially* expanding its business to include retail products to be carried at grocery store outlets." SUF 75.

But, Plaintiff's internal documents and the testimony of its witnesses tell a

---

[5] Plaintiff's only "advertisement" aimed at a national audience was a segment from the CBS evening news on dining-out trends during the recession with a short piece on value-priced eateries, a clip of which was filmed at Plaintiff's West Hills location. SUF 70. Plaintiff has no information about when this piece aired, but claims that it was before 2010. SUF 70.

different story.  Indeed, Plaintiff's Administrative Vice President Matthew Calabrese and Marketing Director Justin Lopez testified that ████████████████████ █████████████████████████████████████████.  SUF 76-79.  ████████████████████████████████████████████ ███████████████████████.  SUF 79.  Indeed, even today, on the "Frequently Asked Questions" page of Plaintiff's website, in response to the question "Are you planning any new locations," Plaintiff states: "[w]e are a *Southern California-based restaurant group and. . . we are currently not expanding*."  SUF 80.  This statement has been on Plaintiff's website since Plaintiff filed this case.  SUF 81.

Most telling is what Plaintiff *has not done*.  Plaintiff has not taken a single concrete step towards entering the retail space with products for sale in grocery stores -- i.e., Plaintiff's supposed "natural zone of expansion."  There are many time-consuming steps that need to be taken to get a brand-new product into retail markets.  SUF 84-93.  Here, Plaintiff has not studied the competitive market for any grocery products, developed any marketing, distribution, or sales strategy, hired any experts in retail product development, attempted to determine licensing or regulatory requirements, entered into any agreements with licenses to sell its products at retail, or tried to market its product to any retailer or distributor.  SUF 94-103, 117.  Indeed, Plaintiff has never tried to develop contacts with buyers at grocery stores, which its own expert identified as a critical step in trying to develop a retail business:

> Q: Do you have any contacts with buyers or people in charge of product selection at national grocery stores?
> A:  Thankfully, no.
> Q:  Do you have any contacts with buyers or people in charge of product selection at any company that sells food products other than your own restaurants?
> A:  No.
> Q:  Have you ever tried to develop contacts at -- with buyers or people in charge of product selection at grocery stores?
> A:  No.

SUF 94, (M. Harrigan Dep. Tr. at 29:12-24.)

Kaduri Shemtov, the co-founder in charge of Plaintiff's operations, admitted that Plaintiff has not taken these steps because Plaintiff has *no product to sell*. SUF 110. And, he admits, Plaintiff's failure to develop a product is solely its own doing. The only steps Plaintiff has ever taken that could conceivably have helped it to develop a product consisted of (1) testing a new barbeque sauce for two weeks in its restaurants in 2011 but aborting that effort because patrons complained; (2) looking at one space for a commercial bakery that could be used both to make bread for the restaurants or to sell at retail but deciding to focus Plaintiff's resources elsewhere; (3) going to a food show in Germany to try unsuccessfully to talk to commercial oven makers on the showroom floor without appointments; and (4) trying unsuccessfully to convince its current bread vendor to enter a partnership with it to produce bread in the Los Angeles area. SUF 111-116, 118-121.

Plaintiff appears to contend for purposes of this litigation that its failure to take any concrete steps towards its stated "plan" to sell food in grocery stores is due solely to the presence of FGF's Stonefire Authentic Flatbreads in supermarkets. SUF 211. But Plaintiff's witnesses have admitted that they have put precisely the same efforts into their expansion plans for the past *five* years, and FGF's Stonefire Authentic Flatbreads have only been in markets for the last *two* years. SUF 104-105. Nor has Plaintiff done anything to determine if FGF's product actually is an impediment to Plaintiff's aspirations of entering the retail food business. SUF 106.

### D. Plaintiff's Licensing Program Façade and Failure to Police Its Marks

In the months prior to filing this lawsuit, Plaintiff embarked on an attempt to create the appearance that it was policing its trademark rights nationwide. In the spring and fall of 2011, Plaintiff sent out a handful of cease-and-desist letters to restaurants whose names include the word "Stonefire." According to Plaintiff, it has (1) filed one lawsuit against Stonefire Pizza and Stone Fire Pizza Company in California for trademark infringement, which was resolved via settlement; (2) granted one license to Stonefire Pizza Company, Inc. in Wisconsin to use the name "Stonefire

Pizza Company"; and (3) sent cease-and-desist letters to three restaurants in Illinois, New Jersey, and South Carolina. SUF 122-124. Plaintiff sent these letters shortly before filing its complaint in this action. SUF 124. Plaintiff claims to have learned of FGF's Stonefire Authentic Flatbreads in July 2011. SUF 210.

Plaintiff further sought to persuade some of these third-party restaurants to accept a license. SUF 125-126. In August 2011, after Stonefire Restaurant and Pub in Yorkville, Illinois received Plaintiff's cease and desist letter, its counsel, Tim Elliott, communicated with Plaintiff's then-counsel, Mr. Margules and received a draft license agreement from Mr. Margules. SUF 125, 133. Mr. Elliott's client decided not to enter into any such license agreement. SUF 133. When Mr. Elliott communicated his client's decision to Mr. Margules, Mr. Margules explained that he wanted to send a letter on Plaintiff's behalf that would imply a license agreement, but *would not require Mr. Elliott's client's signature and thus Mr. Elliott's client would not be bound by a signed document.* SUF 134. Mr. Margules explained that Plaintiff "had to be seen as protecting their mark" because otherwise "that would be problematic for them down the road if they tried to enforce the mark against somebody else." SUF 135. Notably, Plaintiff never visited or even asked to visit Mr. Elliott's client's restaurant, and never requested nor received any quality control records relating to the restaurant. SUF 136-139, 143. Nor did Mr. Elliott's client ever enter any license agreement with Plaintiff or pay any money to Plaintiff. SUF 140. And Plaintiff never filed suit or took any action to stop the use of its mark. SUF 141-142.

Plaintiff's approach to Stonefire American Grill in Elgin, South Carolina, was similar. In June 2011, Plaintiff offered the South Carolina restaurant a perpetual license without having visited it or done any investigation other than view information about it on the Internet. SUF 125, 127-130. Stonefire American Grill, like Mr. Elliot's client, declined the license but still uses the Stonefire name. SUF 131-132.

Stonefire Pizza Company in Wisconsin is the one restaurant that Plaintiff convinced to accept a license. That license is in the form of a letter from Plaintiff

virtually identical to the one Mr. Margules sought to send Mr. Elliott's client, and
grants a royalty free, perpetual license to use the name "Stonefire Pizza Co." or
"Stonefire Pizza Company" in Wisconsin. SUF 123, 134. The letter, not signed by
Stonefire Pizza, contained a provision requiring Stonefire Pizza to "maintain the same
level of quality food and service that currently exists" but provided no indication as to
what that quality level was or how that quality was to be monitored, and did not
provide any criteria or enforcement mechanism. SUF 145-146, 153-154. Mr. Church,
the owner of that restaurant at the time of the license, testified -- just as Mr. Elliott
did -- that Plaintiff actually demanded nothing in return for the license and did nothing
to investigate the quality standards held by the restaurant, either before or after issuing
the license. SUF 149-151, 153-154. Plaintiff's Corporate Representative testified that
before Plaintiff's counsel sent the perpetual license to Stonefire Pizza, no one from
Plaintiff had visited Stonefire Pizza and Plaintiff had no actual knowledge of the
quality of its food or service. SUF 143, 148. And after sending this letter, Plaintiff
never again contacted Stonefire Pizza. SUF 155. Indeed, Plaintiff does not even
know who currently owns the restaurant to which it "licensed" its name. SUF 152.

### E.   Plaintiff's Claim of Confusion Is Supported Only By Anecdotal Stories from Friends and Family A Handful of Post-Suit Emails

Plaintiff served no survey report and identified no expert to opine on confusion
in its case in chief. SUF 174. In response to an interrogatory asking for the
identification of all witnesses with knowledge of actual or potential confusion,
Plaintiff identified only "Justin Lopez, Matthew Calabrese" with no further detail.
SUF 212.



. SUF 156. Mr. Calabrese learned of no such patrons. SUF 157.

The only "actual" consumer confusion identified by any of Plaintiff's witnesses

are hearsay statements by family, friends of employees or unknown people:

- Mr. Calabrese testified that a friend expressed surprise at seeing Stonefire-branded products in grocery stores and that two employees of Plaintiff told him that they had friends who said they were surprised to see Stonefire products in grocery stores, SUF 158-159;
- Mary Harrigan, co-founder of Plaintiff, testified that, after hearing about this case, her cousin's wife told her that she had wondered about the flatbreads she saw at a Southern California supermarket, SUF 161;
- Kaduri Shemtov, also a co-founder, testified that a close friend said he had seen Stonefire Authentic Flatbreads in the store and was surprised, SUF 162;
- Plaintiff produced two electronic customer inquiries sent through the Stonefire Grill website relating to promotions offered by FGF for its Stonefire Authentic Flatbreads, SUF 163; and
- Plaintiff produced one "tweet" that Plaintiff claimed to have found online from someone with the Twitter handle "@Texasfatass" referring to breads he/she had seen in the market in response to a comment about Plaintiff's restaurant, SUF 165.

Messrs. Lopez and Calabrese admitted that they had done nothing to verify the accuracy or reliability of any of these supposed instances of confusion—they had not asked the other employees to provide their friends' contact information, or otherwise sought to confirm these stories in any way. SUF 160. Similarly, they had not attempted to contact the people submitting the two web inquiries, checked to see if the email addresses were valid, or determined the identity of "@Texasfatass." SUF 164, 166. Notably, every one of these supposed instances of confusion occurred well *after* the filing of this lawsuit. SUF 158-159, 161-163, 165. The single instance of potential confusion of which FGF is aware came through its website from an unknown source, also well after this litigation began. SUF 168-169.

### F.   FGF's Marketing Survey Shows No Likelihood of Confusion

FGF, in contrast, retained renowned survey expert, Dr. Gerald Ford, who designed and conducted a survey to assess the likelihood of confusion. SUF 175. Dr. Ford surveyed 310 respondents:  102 from the 7 counties within Southern California, 98 from other parts of California, and 110 from the rest of the country. SUF 176. Not a single respondent reported that he/she believed that Stonefire Grill restaurants made or put out the Stonefire Authentic Flatbreads they were shown. SUF 177. When asked what else, if anything, is done by the company that makes or puts out these

flatbreads, two respondents, both from Southern California, gave answers that were categorized as Stonefire Grill restaurant. SUF 178. The resulting confusion rate is 0.65% nationwide, 1% in California or 1.96% even if one were to consider only Southern California. SUF 179. Based on this, Dr. Ford concluded that the results support a finding of no likelihood of confusion. SUF 180.

### G.   Plaintiff Seeks To Disgorge All of FGF's Revenues

Plaintiff has admitted that it has not suffered any loss as a result of FGF's sale of its Stonefire Authentic Flatbreads and that any claim of "economic harm" would be "speculative." SUF 182-187. Nonetheless, Plaintiff seeks the disgorgement of FGF's profits. SUF 181. Plaintiff's co-founder, Mr. Shemtov, believes that it is fair for Plaintiff to recover all of FGF's profits simply because FGF uses the name "Stonefire," regardless of whether anyone is confused. SUF 172.

### H.   Plaintiff's Claim of Willfulness

In its complaint, Plaintiff alleges that FGF not only infringed Plaintiff's rights but did so intentionally. (Dkt. No. 31-1.) The only factual support Plaintiff could identify for this allegation, however, is (1) that FGF used a sampling truck to promote its Stonefire Authentic Flatbread product in the Los Angeles area for three days in 2012 and that (2) FGF was featured on *Hell's Kitchen*, which, as a nationally-syndicated television show, aired in Southern California. SUF 188-190. Plaintiff proffers no evidence that either of these events was intended to, or did, deceive the consuming public.

## III.   LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery and any affidavits "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A party opposing a properly made and supported motion for summary judgment may not rest upon mere

1   denials but "must set forth specific facts showing that there is a genuine issue for

2   trial." *Id.* at 248. Where, as here, the non-moving party bears the burden of proving

3   an essential element of its case, that party must make a showing sufficient to establish

4   a genuine issue of material fact with respect to the existence of that element or be

5   subject to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

6   An issue is genuine if evidence is produced that would allow a reasonable jury to

7   reach a verdict in favor of the non-moving party. *Anderson*, 477 U.S. at 248.  In that

8   regard, however, a "mere 'scintilla' of evidence will not be sufficient to defeat a

9   properly supported motion for summary judgment; rather, the nonmoving party must

10   introduce some significant probative evidence tending to support the complaint."

11   *Echo Drain v. Newsted*, 307 F. Supp. 2d 1116, 1120-21 (C.D. Cal. 2003) (quoting

12   *Summers v. Teichert & Son, Inc.,* 127 F.3d 1150, 1152 (9th Cir. 1997).

13   **IV.   FGF IS ENTITLED TO SUMMARY JUDGMENT ON EACH CLAIM**

14   Plaintiff has alleged causes of action for trademark infringement under federal

15   and California law, false designation of origin and unfair competition under federal

16   law, and unfair competition under California law.  (Dkt. No. 31-1.)  Plaintiff also

17   seeks cancellation of FGF's own "Stonefire" mark, on the basis that it is likely to

18   cause confusion with Plaintiff's "Stonefire Grill" mark.  To succeed on *any* of

19   Plaintiff's claims, it must establish a likelihood of confusion.  *See, e.g., M2 Software,*

20   *Inc. v. Madacy Entm't*, 421 F.3d 1073, 1080 n.5 (9th Cir. 2005) (affirming summary

21   judgment for defendant on each of plaintiff's federal, state and common law

22   trademark claims as well as its false designation and unfair competition claims,

23   because plaintiff had not shown  likelihood of confusion).  Each of Plaintiff's claims

24   also requires Plaintiff to show that it owns viable trademark rights.  As set forth more

25   fully below, Plaintiff has insufficient evidence to establish a likelihood of confusion

26   and, due to its sham licensing tactics, has lost its trademark rights as a matter of law.

27   **A.    Plaintiff Cannot Show The Requisite Likelihood of Confusion**

28   To establish the likelihood of confusion required to prevail on its claims,

13

Plaintiff must come forth with sufficient evidence to show that a substantial portion of the consuming public is likely to be confused. *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1163 (9th Cir. 2009). Here, Plaintiff has alleged forward confusion, i.e., that the buying public is likely to be confused into believing that Plaintiff was either the source of, or was sponsoring, the FGF's Stonefire Authentic Flatbreads.[6] (Dkt. No. 31-1 ¶¶ 22-23.) To analyze likelihood of confusion, courts in the Ninth Circuit consider the following eight factors: (1) strength of the mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels; (6) degree of consumer care; (7) the defendants' intent; and (8) likelihood of expansion. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).[7] While the plaintiff need not satisfy every factor, the plaintiff must make a strong showing as to at least some of the factors to survive summary judgment. *Surfvivor*, 406 F.3d at 631. Because Plaintiff bears the burden of proof, FGF need not produce evidence showing the absence of a genuine issue of fact but simply must show that there is an absence of *evidence* to support Plaintiff's case. *Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1087 (C.D. Cal. 2003) (citing *Celotex*, 477 U.S. at 325).

Tellingly, Plaintiff's response to an interrogatory asking it to "[s]tate the entire basis for and each fact supporting [its] claim supporting [its] claim of trademark infringement against Defendant" is *entirely devoid of facts*. SUF 188. Applying the *Sleekcraft* factors and relevant law to the evidence amassed in this case, it is clear that Plaintiff cannot make the requisite showing to survive summary judgment.

> 1.    *Plaintiff's Marks Are Not Strong*

Plaintiff's own evidence and admissions demonstrate that Plaintiff's marks are not strong. Plaintiff offers its services only through its seven restaurants in Southern

---

[6] Because Plaintiff has never alleged reverse confusion, Plaintiff cannot pursue that theory at trial. *Surfvivor Media, Inc. v. Surfvivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005). Regardless, Plaintiff has no evidence or facts to support a reverse confusion claim either.

[7] The same likelihood of confusion factors apply to Plaintiff's infringement claims under California law and its federal and state unfair competition claims. *M2 Software*, 421 F.3d at 1080 n.5.

California.  SUF 31, 33.  Plaintiff did little advertising before 2010 and has always

focused its efforts within its limited geographic area.  SUF 63-69.  Mary Harrigan,

Plaintiff's owner and founder, testified that she believed the mark was strong in

Southern California (based on sales volumes) but admitted that she could not speak to

its strength elsewhere.  SUF 191-192.  Kaduri Shemtov, responsible for Plaintiff's

day-to-day business operations, agreed.  SUF 193.  Indeed, Plaintiff's rebuttal

marketing expert, Dr. Jacob Jacoby wrote in his report that "[i]t is probable that the

mark 'Stonefire Grill' is neither famous nor strong in Northern California . . . or

especially the rest of the country."  SUF 194.  Notably, although Plaintiff *believes* its

mark is strong in Southern California, Plaintiff has produced no survey, study or other

objective evidence to support its belief.  SUF 174.

Moreover, a mark's strength is also undermined by third-party use.  *See, e.g.,*

*Matrix Motor Co.*, 290 F. Supp. 2d at 1091 (finding mark "exceedingly weak" where

defendant identified multiple other users of same name within plaintiff's relevant class

of goods); *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 990-92 (C.D. Cal. 2002)

(same).  Multiple other restaurants use names that include the word "Stonefire."  *See*

Section II.D, *supra*; SUF 13, 15.  In light of these facts, Plaintiff's marks must be

considered weak and not entitled to a high level of protection.  Based on the

uncontroverted evidence, this factor heavily favors FGF.

### 2. *Flatbreads Are Not Closely Related to Restaurants*

Plaintiff claims that its restaurant services and FGF's Stonefire Authentic

Flatbreads are "related" because "both [parties] are in the business of selling

comestibles, particularly bread products." SUF 195.  Plaintiff's overly simplistic

position is contrary to law, which requires much more than that two parties both sell

"comestibles." *See, e.g., Echo Drain*, 307 F. Supp. 2d at 1125 (finding relatedness of

goods factor weighed in favor of defendant where both plaintiff and defendant were

musical bands but played different genres of music).  Indeed, courts find this factor

weighs against the plaintiff even where both parties are restaurants if those restaurants

1  have different menus and different ambiance.  *See Dan Tana v. Dantanna's*, 611 F.3d

2  767, 777-78 (11th Cir. 2010) (rejecting plaintiff's argument that parties offered similar

3  goods/services because both were restaurants that served meat and fish)[8]; *In re Coors*

4  *Brewing Co.*, 343 F.3d 1340, 1345-46 (Fed. Cir. 2003) (mere fact that many

5  restaurants serve beer is not enough to render restaurant services and beer related for

6  purpose of the likelihood of confusion analysis); *Amstar Corp. v. Domino's Pizza,*

7  *Inc.*, 615 F.2d 252, 261 (5th Cir. 1980) (expressly rejecting argument that defendant's

8  restaurant services and plaintiff's sugar products were related and noting "[a]bout the

9  only things they have in common are that they are edible."); *Truckstops Corp. of Am.*

10  *v. C-Poultry Co. Ltd.*, 596 F. Supp. 1094, 1099 (M.D. Tenn. 1983) (finding plaintiff's

11  restaurant services not related to defendant's poultry sold in grocery stores).  This

12  factor also weighs heavily in favor FGF.

13              *3.    The Marks Are Not Similar*

14        Without analysis, Plaintiff contends that its "Stonefire Grill" mark and FGF's

15  "Stonefire" mark are almost identical in terms of sight, sound and meaning.  SUF 213.

16  The presence of a common word, however, is not enough to render two marks

17  "similar" in the trademark sense.  *See, e.g., Official Airline Guides v. Goss*, 6 F.3d

18  1385, 1392 (9th Cir. 1993) (finding no confusion between "OAG Travel Planner" and

19  "The Travel Planner USA"); *Glow Indus.*, 252 F. Supp. 2d at 996 (two products'

20  marks visually distinct, though both contained the word "Glow").  Each mark must be

21  considered in its entirety as it would be found in the market place.  *Id.* at 994.

22        In context and viewed as a whole, the marks convey different visual

23  impressions.  SUF 196.  First, FGF's registration is for the word STONEFIRE alone,

24  although the logo also clearly says "Authentic Flatbreads."  SUF 199. FGF's logo

25  features hand scripted white letters with only the initial letter capitalized, against a

26  rust-colored background with the symbolic feature of an orange-colored fire and seeks

27  to convey a rustic, genuine, and authentic identity. SUF 196, 200.  In contrast,

28

---

[8] The plaintiff in the *Dan Tana v. Dantanna's* case was represented by Plaintiff's counsel here.

1    Plaintiff's marks all feature the word "Grill" and one adds a lengthy clause "A Fresh

2    Approach to Family Dining!" SUF 197.  Plaintiff also uses all capital red letters that

3    appear to be on fire against a light, stone colored background.  SUF 198.  Plaintiff's

4    logo, unlike FGF's, conveys a bold, hot identity, appropriate for barbeque restaurants.

5    SUF 198. In short, the parties' marks differ.  This factor too favors FGF.

6              4.    *Plaintiff's Evidence of Supposed Confusion is Legally Insufficient*

7           Plaintiff proffers no survey to support its claim of confusion but instead relies

8    on a handful of comments from people supposedly confused.  Plaintiff's failure in this

9    regard strongly suggests that there is no likelihood of confusion.  *Cairns v. Franklin*

10   *Mint Co.,* 24 F. Supp. 2d 1013, 1041 (C.D. Cal. 1998) (survey evidence is often the

11   most persuasive evidence of confusion and "a plaintiff's failure to conduct a consumer

12   survey . . . may lead to an inference that the results of such a survey would have been

13   unfavorable"); *James R. Glidewell Dental Ceramics, Inc. v. Keating Dental Arts, Inc.,*

14   No. SACV-11-1309-DOC, 2013 WL 655314, at *9 (C.D. Cal. Feb. 21, 2013) (same);

15   *see also Surfvivor,* 406 F.3d at 633-34 (affirming grant of summary judgment where

16   defendant offered survey evidence showing no likelihood of confusion and plaintiff

17   offered *no* survey evidence of confusion and instead pointed to a couple of instances

18   of actual confusion).  In contrast, as detailed in Section II.F, FGF retained a highly

19   respected survey expert, Dr. Gerald Ford, to conduct a survey to test Plaintiff's

20   allegations of confusion.  SUF 175.  Dr. Ford designed and conducted a gold-standard

21   *Eveready* survey and concluded that there is no likelihood of confusion.  SUF 176-

22   180.  Even when considering only Southern California respondents (where Plaintiff

23   claims its mark is strongest), Dr. Ford's survey yielded a confusion rate of less than

24   2% -- far below the threshold level required by courts to support a finding of a

25   likelihood of confusion.  *Cairns,* 24 F. Supp. 2d at 1140 (survey evidence showing

26   confusion level much below 10% clearly favors defendant);[9] SUF 179.

27   _____

28   [9] The critique of Dr. Ford by Plaintiff's rebuttal expert, Dr. Jacoby, who did no empirical research or survey of his own despite his credentials and ability to do so, cannot save Plaintiff from summary judgment. *See, e.g., Oyster Software, Inc. v. Forms Processing, Inc.,* No. 00 Civ. 724, 2001 WL

1    Evidence of actual consumer confusion may constitute strong proof of the fact

2    of a likelihood of confusion, but to carry its burden of showing that a significant

3    portion of the population is likely to be confused, a plaintiff must do more than point

4    to a few anecdotal stories:

> [j]ust as one tree does not constitute a forest, an isolated instance of
> confusion does not prove probable confusion. To the contrary, the law
> has long demanded a showing that the allegedly infringing conduct
> carries with it a likelihood of confounding *an appreciable number of
> reasonably prudent purchasers* exercising ordinary care.

8    *Id.* at 1042 (citing McCarthy on Trademarks, § 23:14 at 23-49). Consistent with this

9    approach, courts in this Circuit and elsewhere have consistently held that plaintiffs in

10   trademark cases cannot survive summary judgment on the issue of likelihood of

11   confusion by pointing to a few isolated, unsubstantiated instances of alleged

12   confusion. *See, e.g., Surfvivor*, 406 F.3d at 629 (affirming summary judgment of no

13   infringement where plaintiff pointed to only a few instances of actual confusion);

14   *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842-43 (9th Cir. 2002) (affirming summary

15   judgment of no infringement where plaintiff's proffered evidence of actual confusion

16   consisted of a several dozen inquiries he had received over the years regarding

17   whether parties were related); *Echo Drain*, 307 F. Supp. 2d at 1126 (granting

18   summary judgment of no trademark infringement, holding that plaintiff's proffer of

19   four letters and a few emails and website postings was not sufficient evidence of

20   actual confusion); *Dan Tana*, 611 F.3d at 779 (affirming summary judgment of no

21   infringement despite plaintiff's customer affidavit and defendant's admission that two

22   of its customers had asked about an affiliation with plaintiff).

23   Indeed, courts grant summary judgment in favor of the defendant where the

24   "evidence" is precisely the type proffered by Plaintiff here. In *Echo Drain*, for

---

25   1736382 (N.D. Cal. Dec. 6, 2001) ("expert's declaration, full of assertions but empty of facts and
26   reasons won't get a case past a motion for summary judgment"); *Whirlpool Props., Inc. v. LG Elecs.
     U.S.A., Inc.*, No. 1:03-CV-414, 2006 WL 62846, at *3 (W.D. Mich. Jan. 10, 2006) (expert's failure
27   to put forward survey despite claimed expertise in survey design and implementation significantly
     undermined plaintiff's criticisms of defendant's survey); *Anheuser-Busch, Inc. v. Caught-on-Bleu,
28   Inc.*, 288 F. Supp. 2d 105, 122 (D.N.H. 2003), *aff'd*, 105 F. App'x 285 (1st Cir. 2004) (summary
     judgment not precluded by expert designated to criticize opposing party's survey).

1    example, the plaintiff offered no survey or expert reports to prove a likelihood of

2    confusion, but instead pointed to four letters from friends and a few unauthenticated

3    emails and web postings purportedly demonstrating actual confusion as evidence of a

4    likelihood of confusion. *Echo Drain*, 307 F. Supp. 2d at 1126. The court found that

5    the actual confusion factor weighed in favor of a finding of no infringement, and

6    granted summary judgment. *Id.* at 1126-27. In so holding, the court noted expressly

7    that (1) letters from plaintiff's friends were "not probative of actual confusion" and (2)

8    a "few unauthenticated e-mails and webpostings standing alone are not sufficient

9    evidence of actual confusion." *Id.* at 1126; *see also Walter v. Mattel, Inc.*, 210 F.3d

10   1108, 1111 (9th Cir. 2000) (evidence of actual confusion from acquaintances, friends,

11   and family of plaintiff properly disregarded); *Nordstrom Inc. v. NoMoreRack Retail*

12   *Group, Inc.*, No. C12-1853-RSM, 2013 WL 1196948, at *6 (W.D. Wash. Mar. 25,

13   2013) (isolated instances of confusion cloaked in anonymity on the Internet not

14   evidence of actual confusion in purchasing decision); *Machine Head v. Dewey Global*

15   *Holdings, Inc.*, 2001 U.S. Dist. Lexis 22759, *28, 61 U.S.P.Q.2d 13B (N.D. Cal. Dec.

16   13, 2001) ("misdirected emails, alone, are insufficient evidence of actual confusion"

17   because inadvertently landing on website is different from being confused).

18           Plaintiff's evidence of confusion in this case, as described in Section II.E *supra*

19   above, consists of three misdirected emails from unknown sources, one mysterious

20   "tweet," and a few inadmissible hearsay comments from family and friends of

21   Plaintiff's owners and employees, all dated well after the inception of this lawsuit.

22   SUF 158-159, 161, 163, 165. As in *Echo Drain, Walter*, and *Machine Head*, this

23   evidence is insufficient to defeat summary judgment. This is particularly so because

24   Plaintiff put forth no survey evidence to bolster its claim of confusion, which raises a

25   presumption that if Plaintiff had done a survey, the results would have been

26   unfavorable. *Cairns*, 24 F. Supp. 2d at 1041 ("a plaintiff's failure to conduct a

27   consumer survey . . . may lead to an inference that the results of such a survey would

28   be unfavorable"); *Glidewell Dental, Inc.*, No. SACV-11-1309-DOC, 2013 WL

655314, at *9 (same); *see also Surfvivor,* 406 F.3d at 633 (affirming grant of summary judgment where evidence similar to that here). This factor, like the others discussed above, heavily favors FGF.

>    5.    *The Parties' Marketing Channels are Distinct*

Plaintiff alleges that the parties' marketing channels are similar because "[b]oth Defendant and [Plaintiff] sell their goods/products to individual consumers in a retail setting, rather than to business entities." SUF 201. If courts were to adopt Plaintiff's overly simplistic view of this factor, however, every business that sold products to consumers in a retail setting would be considered to use the same marketing channels. That is not the law. Instead, courts examine the proximity of the specific marketing channels, whether direct competition exists, and whether the products are marketed side-by-side. *Sleekcraft,* 599 F.2d at 353; *Truckstops Corp. of Am.,* 596 F. Supp. at 1100. Courts also consider the similarity of advertising. *Nutri/System, Inc. v. Con-Stan Indus., Inc.,* 809 F.2d 601, 606 (9th Cir. 1987).

Plaintiff is a chain of Southern California restaurants, and does not sell *any* products to supermarkets. SUF 31, 110. FGF is a supplier of baked goods (including flatbreads) to retail markets across North America. SUF 20, 204. Plaintiff's restaurant services and FGF's flatbreads are not sold in the same stores, nor are they encountered side-by-side in the marketplace. SUF 202. FGF's marketing is geared at a national audience, while Plaintiff focuses its advertising and promotions on Southern California.[10] (*See* discussion at Sections II.A, B, *supra.*) And there is no evidence that the parties' actual advertisements are similar.[11] As with the other factors, this factor heavily favors FGF.

>    6.    *Degree of Consumer Care*

Citing no facts, Plaintiff claims that the degree of consumer care relevant to this

---

[10] Plaintiff's contention that it operates nationally simply because it offers gift cards on its website is disingenuous because those gift cards must be redeemed in California. SUF 71-72.

[11] Nor is the fact that both parties maintain a web presence and social media accounts sufficient to tip this factor in Plaintiff's favor. *Nordstrom,* No. C-12-1853-RSM, 2013 WL 1196948 at *7.

case is "quite low" because Defendant is selling flatbreads, "which are relatively inexpensive." SUF 205-206. In fact, as a branded specialty food item, FGF's flatbreads are *not* an impulse buy. SUF 207. This factor favors FGF or is neutral.

### 7. Defendant Proceeded With Good Faith at All Times

Plaintiff alleges that FGF "selected its 'Stonefire' mark with the intent of benefiting from the goodwill and positive reputation garnered by the [Plaintiff's] Mark" solely because FGF "was on constructive notice as to [Plaintiff] rights to the Stonefire [sic] based upon . . . trademark registrations." SUF 214. But the fact that an alleged infringer *knew* of the plaintiff's mark prior to selecting its own mark is not sufficient to tip this factor in favor of the plaintiff where, as here, the undisputed evidence shows that the defendant proceeded in good faith. *M2 Software*, 421 F.3d at 1085 (finding "intent" factor favored defendant even though defendant knew of plaintiff's mark from search report when selecting its own mark and affirming summary judgment of no infringement.).

The undisputed facts show that FGF selected its mark in good faith. FGF hired experienced branding consultants (that pre-cleared suggested names) and hired its own sophisticated trademark counsel to ensure that they were choosing a name that was available for use in the relevant class of goods. SUF 5-7, 10. ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ SUF 27-28. On these facts, no reasonable jury would find that FGF chose its mark intending to capitalize on Plaintiff's barbeque restaurants. This factor too weighs in favor of FGF.

### 8. Plaintiff Has No Evidence of Its Supposed Plans to Expand

To resolve the final likelihood of confusion factor, likelihood of expansion, courts consider whether there is a *strong* likelihood that either party may expand [its] business to compete with the other." *Official Airline*, 6 F.3d at 1394 (holding that the expansion factor favored defendant where plaintiff could not show a strong likelihood that it would compete with the defendant in the same market with the same product)

1   (emphasis added).  Here, Plaintiff claims to have plans of "*potentially* expanding its

2   business to include retail products to be carried at grocery stores."  SUF 75.  Yet

3   Plaintiff has not taken a single concrete step toward effectuating its dreams of

4   expansion.  (*See* discussion Section II.C *supra*.)  Plaintiff's mere aspirations of

5   expansion, without concrete steps to further those plans, cannot save it from summary

6   judgment.  *See, e.g., Surfvivor*, 406 F.3d at 634 (likelihood of expansion factor

7   favored defendant where plaintiff only expressed interest in expanding, noting "mere

8   speculation is not evidence"); *Matrix Motor*, 290 F. Supp. 2d at 1096 ("Speculative or

9   unrealistic plans cannot be considered.").  This factor, too, strongly favors FGF.

10                                                      * * *

11          In short, the *Sleekcraft* factors, on the whole, so strongly favor FGF that no

12   reasonable jury can find a likelihood of confusion.  FGF is thus entitled to summary

13   judgment on each of Plaintiff's claims and on its own declaratory relief claim for non-

14   infringement.  *See, e.g.*, *M2 Software*, 421 F.3d 1073(affirming summary judgment of

15   no infringement even though some *Sleekcraft* factors favored plaintiff); *Cohn*, 281

16   F.3d at 841, 842 (same); *Surfvivor*, 406 F.3d at 634-35 (same); *Glidewell Dental*, No.

17   SACV-11-1309-DOC, 2013 WL 655314, at *11 (granting summary judgment of no

18   infringement where some factors favored plaintiff); *Dan Tana*, 611 F. 3d at 782.

19          **B.    Plaintiff Has Abandoned Any Rights In Its Marks Through Its
                   Naked Licensing and Sham Efforts to Police**

20          Even if Plaintiff could show likelihood of confusion (which it cannot), FGF is

21   entitled to summary judgment because Plaintiff has abandoned its trademarks as a

22   matter of law.  A trademark owner abandons its mark when it engages in any course

23   of conduct, "including acts of omission as well as commission, [that] causes the mark

24   to . . . lose its significance as a mark." 15 U.S.C.A. § 1127 (2006).[12]  Ninth Circuit

25   law is clear that a trademark owner abandons its rights by granting a "naked license."

26   *Barcamerica*, 289 F.3d at 598 (naked licensing is "inherently deceptive and

27   _____

28   [12] *See also* Cal. Bus. & Prof. Code § 14202(i)(2) (same abandonment standard for state registrations).
     Plaintiff may argue that "abandonment" affects only to its federal registrations, but its sham policing
     and licensing scheme across the country should result in the abandonment of all of its rights.

                                                      22

1    constitutes *abandonment of any rights to the trademark*"); *FreecycleSunnyvale v.*

2    *Freecycle Network*, 626 F.3d 509, 519 (9th Cir. 2010).  When entering a license, a

3    trademark owner must maintain reasonable control over the quality of the goods or

4    services sold by its licensee.  *Barcamerica*, 289 F.3d at 595-96.  When the licensor

5    fails to do so, "naked licensing" occurs.  *Id.* at 596.

6         The Ninth Circuit has found abandonment through naked licensing in precisely

7    the circumstances here.  In *Barcamerica,* for example, the Ninth Circuit affirmed

8    summary judgment for the defendant based on abandonment where the plaintiff had

9    licensed its mark for use on wine without a quality control provision in the license and

10   had played "no meaningful role in holding the wine to a standard of quality -- good,

11   bad, or otherwise." *Id.* at 597.  Similarly, in *FreecycleSunnyvale*, the Ninth Circuit

12   affirmed summary judgment of abandonment where the trademark holder had licensed

13   its mark but (1) did not retain express contractual control over the licensee's quality

14   control measures, (2) did not have actual control over the licensee's quality control

15   measures, and (3) was unreasonable in relying on the licensee's own quality control

16   measures.  *FreecycleSunnyvale*, 626 F.3d at 516.

17        Plaintiff's naked licensing is readily apparent here based on the undisputed

18   facts.  As described in detail in Section II.D *supra*, Plaintiff granted a perpetual, free

19   license to Stonefire Pizza Company to use the name "Stonefire" in Wisconsin without

20   making any effort to put quality control measures into place.  Indeed, Plaintiff granted

21   this license without ever visiting the Stonefire Pizza restaurant, doing any

22   investigation of it (other than look online) or inquiring about the restaurant's quality

23   of food or services before or after the license was issued.  SUF 143, 148-152.  As

24   Stonefire Pizza's owner testified, Stonefire Pizza was required to do nothing -- not

25   even sign the license. SUF 153-154.  This farce of a license is precisely what the

26   Ninth Circuit considers "deceptive" and a naked license that warrants the loss of

27   trademark rights.  *See Barcamerica*, 289 F.3d at 589.[13]  Under Ninth Circuit law,

28   _____

[13] Plaintiff's efforts to coerce others across the country to enter identical naked licenses to create the

1    therefore, Plaintiff abandoned its trademarks and cannot enforce them against FGF.[14]

2    On that basis, FGF is entitled to summary judgment on Plaintiff's claims.

## V.  PLAINTIFF'S MARK IS VOID *AB INITIO* BECAUSE IT HAD NOT BEEN USED IN INTERSTATE COMMERCE WHEN REGISTERED

To obtain a federal trademark registration, a party must use its mark in *interstate* commerce. *See* Trademark Manual of Examining Procedure § 901, 901.1. While a party may file an application based on an "intent to use," *id.* at § 901, the applicant must actually use the mark in interstate commerce on or in connection with the goods and services as specified in the application and file an allegation of use before a registration will issue. *Id.* Because, as discussed in Section II.B *supra*, Plaintiff was not using its "Stonefire Grill" mark in interstate commerce at any time prior to the issuance of Registration No. 2,880,327, the registration is void *ab initio* as a matter of law and should be cancelled. *See Aycock Eng'g., Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1357-60 (Fed. Cir. 2009) (registration of mark that does not meet interstate commerce use requirement is void *ab initio*). FGF is thus entitled to summary judgment that Registration No. 2,880,327 should be cancelled.

Plaintiff also has proffered no evidence that it used the marks set forth in Registration Nos. 3,716,351 (Stonefire Grill design mark) and 3,716,355 (STONEFIRE GRILL A FRESH APPROACH TO FAMILY DINING!) in interstate commerce prior to their 2009 registrations either. SUF 31, 33, 60, 66-68, 70, 74. Absent such evidence, FGF is entitled to summary judgment that those registrations too should be cancelled.

## VI.  PLAINTIFF IS NOT ENTITLED TO DISGORGE PROFITS

Even if Plaintiff could show that FGF had infringed any valid trademark of Plaintiff, Plaintiff is not, as a matter of law, entitled to the sole remedy that it seeks: to

---

façade of enforcement underscores the deceptiveness of its practices. *See* Section II.D.

[14] Moreover, Plaintiff stopped using the tag line "A fresh approach to family dining!" in 2010, SUF 208, which is *prima facie* evidence of abandonment of the mark in Reg. No. 3,716,355. *See* 15 U.S.C. § 1127. *See also* Cal. Bus. & Prof. Code § 14202(i)(1) (two years of non-use is *prima facie* abandonment).

disgorge FGF's profits. SUF 181-182. Plaintiff seeks disgorgement despite admitting
that it has not suffered any loss whatsoever from FGF's alleged infringement. SUF
183-187. Under these circumstances, Plaintiff must show that FGF "willfully" chose
its "Stonefire" mark to "exploit the advantage" of Plaintiff's marks. *See Lindy Pen
Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1405-07 (9th Cir. 1993); *Adray v. Adry-
Mart, Inc.*, 76 F.3d 984, 988 (9th Cir. 1995) (plaintiff who had disclaimed any intent
to seek damages based on lost sales could recover the defendant's profits only if the
infringement was willful).

Plaintiff cannot make this showing. Plaintiff has adduced *no* evidence that FGF
chose the "Stonefire" mark in an attempt to exploit any advantage of Plaintiff's mark.
Indeed, Plaintiff admits that its only evidence of willfulness is that (1) FGF used a
food sampling truck to promote its Stonefire Authentic Flatbreads in the Los Angeles
Area for three days in 2012 and that (2) FGF was featured on a nationally-syndicated
show that aired in California. SUF 189-190. These facts alone are woefully
insufficient to establish willfulness. Indeed, the undisputed facts show that FGF
proceeded with caution and good faith in researching, considering and selecting the
"Stonefire" mark. SUF 5-18. And the undisputed evidence also shows that ███

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ SUF 27-28.

In short, Plaintiff has put forth no evidence to create a triable issue of fact
sufficient to deny summary adjudication that FGF did not select its mark in willful
disregard of Plaintiff's rights and thus Plaintiff is not entitled to disgorgement.

## VII.   CONCLUSION

For all of the foregoing reasons, FGF respectfully requests that the Court enter
summary judgment in its favor on all claims.

DATED: June 14, 2013

KIRKLAND & ELLIS LLP

By: ~~Diana~~ M. Torres
Attorneys for Defendant FGF Brands, Inc.