Diana M. Torres (S.B.N. 162284)
diana.torres@kirkland.com
Allison W. Buchner (S.B.N. 253102)
allison.buchner@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

Dale Cendali, *pro hac vice*
dale.cendali@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Attorneys for Defendant
FGF, INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| STONEFIRE GRILL, INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>FGF BRANDS, INC., a Canadian corporation, doing business as STONEFIRE AUTHENTIC FLATBREADS,<br><br>Defendant. | CASE NO. CV 11-8292-JGB (PJWx)<br><br>**DECLARATION OF RHONDA HARPER, MBA IN SUPPORT OF DEFENDANT FGF BRANDS, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: July 15, 2013<br>Time: 9:00 a.m.<br>Room: Riverside-Courtroom 1<br><br>**Hon. Jesus G. Bernal** |

I, Rhonda Harper, do hereby declare and state as follows:

1. At the request of Kirkland & Ellis, LLP, counsel for Defendant FGF Brands, Inc., I have been retained as an expert witness to provide opinions from the perspective of an experienced marketing professional regarding certain factors which I understand the Court may consider in determining whether there is a likelihood of confusion between the marks of FGF Brands and Plaintiff. It is my opinion that there is no likelihood of confusion between Plaintiff's and Defendant's marks.

**Professional Qualifications**

2. I am currently the owner of Rhonda Harper LLC, a marketing consulting and expert testimony limited liability corporation in Dallas, Texas. I have personal knowledge of the facts set forth herein and, if called to testify, could do so competently. I have more than 20 years of professional marketing, research, strategy, brand, and innovation experience with Fortune 500 corporations across industries including Consumer Package Goods (i.e. Health and Beauty Aids; Gastro/Intestinal; OTC Healthcare; Snack Foods; Beverage; and Food), Retail, Apparel, Technology, Transportation, Financial Services, and Interactive.

3. I began case consulting, research, and expert testimony in 2005 as part of RTM&J, a strategic marketing consultancy that I founded in 2001. In 2010, I closed that firm, and continued the case consulting, research, and expert testimony under a new firm I founded, Rhonda Harper LLC.

4. My strategic marketing consulting firm's clients included Arby's, Target Stores, Equifax, The Coca-Cola Company, CSM, The Home Depot, HSN, Kellogg's, Papa John's, Russell Corporation, Sage, SC Johnson, Tyson Foods, and Turner Broadcasting. I was also the Office Director and SVP of Ketchum Public Relations from 2005-2007.

5. I am a former Officer and Vice President of Marketing for Wal-Mart Stores as well as VF Corporation, the world's largest apparel company. In both positions, Walmart Stores/Sam's Club and VF Intimates, I held full company

accountability for brand marketing, research and insights, database management, consumer research, creative services, new product development, consumer and market trending, licensing (VF), marketing services (i.e. advertising, promotion, event marketing, and public relations), production, in-store merchandising, and website marketing.

6. I am also the former Global Director of Marketing Communications for United Parcel Service (UPS), where I led the teams responsible for strategy creation, research, development, and implementation of global marketing/communication initiatives across all business units.

7. My experience also includes marketing, brand management, strategic planning, market/consumer research and insights, as well as consumer promotion experience with the headquarters offices of Nabisco's Biscuit Division (i.e. cookies and crackers), Warner-Lambert's Consumer Healthcare Division (i.e. oral care, skin care, allergy care, and gastrointestinal care), and American Red Cross Blood Services as well as public relations experience as Director/SVP for Ketchum public relations.

8. I received a B.S. in Education from Illinois State University in 1984 and an M.B.A. from the Goizueta Business School of Emory University in 1988.

9. I am also a former high school math teacher and have been an adjunct marketing professor at American University and Fairleigh Dickinson University. I am a regular guest lecturer at the Goizueta Business School, where I am a member of the Alumni Board of Directors, serve as an annual Emory University M.B.A. Goizueta Marketing Case Competition judge, and a mentor to M.B.A. students. I am an author and frequent keynote and expert speaker for various corporations, universities, and industry associations.

**Opinions**

*No Likelihood of Confusion*

10. The Plaintiff's and Defendant's businesses are highly differentiated and distinct. The Plaintiff and Defendant are unlikely to compete in the marketplace with

1. bread products.

2. 11. The Plaintiff's and Defendant's marks are distinctive. The Plaintiff's mark is not solely and strongly nationally identified with the Plaintiff. The Plaintiff's restaurants are narrowly confined to the geography of Southern California. Most people going to a restaurant do not drive long distances, especially for casual ones.

12. Many other restaurants across the United States use the name "Stonefire." A quick Google search using the term "Stonefire Restaurant" produced thousands of records. On the first few pages of results alone, the following were identified: Stonefire Pizza Company, New Berlin, WI; Stonefire Restaurant and Pub, Yorkville, IL; Stonefire Station and Kitchen, Barboursville, VA; Stonefire American Grill, Elgin, SC; Burwell's Stone Fire Grill, Charleston, SC; Stonefire Grillehouse & Bar, Randolph, NJ; Stone Fire Bistro, Queens, NY; Stonefire Bistro, Brighton, MI.

13. Although both Plaintiff's and Defendant's trademarks include the word "Stonefire," they are marketing two different identities, each with mutually exclusive strength and identity:

 

14. In my view, these logos would convey different brands if encountered in the marketplace.

15. The identity Plaintiff appears to seek to convey through its logo is bold and hot, with all capital red letters that are "on fire" against a light, stone colored background. The mark includes an emphasis on the word "grill." Defendant's identity sought to be conveyed through its logo is rustic, genuine, and approachable, with hand-script white letters all in lower case, with the exception of the first letter, on a rust-colored background. Its mark has a symbolic feature of an orange fire and clearly states "Authentic Flatbreads."

16. Applying my expertise and experience, it is my opinion that consumers

DECLARATION OF RHONDA HARPER                    CASE NO: CV 11-8292

are not likely to be confused between the Plaintiff's and Defendant's marks.

***Likelihood of Expansion***

17. The Plaintiff and Defendant operate in different competitive sets. A competitive set is defined as those companies from which one seeks to take market share and therefore regularly tracks, measures, and strategizes against. As these efforts are resource intensive, a competitive set is generally narrowly focused. The Plaintiff, a small restaurant chain located in Southern California, competes with other restaurants in the same local. Its customer base is likely to live within the same general area of each restaurant. A restaurant is a service provider first and a food provider second. The Plaintiff acknowledges this in its marketing efforts, using a service-oriented, experiential based tagline: "A Fresh Approach to Family Dining!" As a national/international sweet goods and bread manufacturer, the Defendant's competitive set includes bread manufacturers and distributors, not restaurants.

18. It is highly unlikely that the Plaintiff's and Defendant's growth strategies will lead them into similar or the same products and services.

19. For the Plaintiff to attempt to enter the consumer package goods retail industry would be extremely costly and have a very low chance of success. The Plaintiff would have to invest in expertise and technological resources that go well beyond its current capabilities. Intensive marketing and research and development costs would need to be absorbed to learn the new markets. Plaintiff would need to create a specialized sales force and establish new customer relationships. The Plaintiff would need to create a capability to formulate and produce a food product and distribute it to a mass audience. This process includes: research, development, consumer research, market research, feasibility testing, sample production, marketing and sales plans, packaging, distribution plans, and others. Plaintiff would need to thoroughly understand and adhere to FDA and other regulatory agencies' policies. The product development and innovation process is complicated and time consuming. After defining objectives, identifying platforms for growth, and brainstorming ideas,

Plaintiff would need to continue to work through concept development, product development, production and launch planning (on both the commercial and production ends), launching the product, and post-launch review at various benchmarks.

20. To penetrate this market at the expense of a competitor, given a limited shelf space allotment, the Plaintiff would need to have many new areas of expertise and experts to compete at retail, including: Innovation, Product Development, Product Management, Category Management, Marketing, Trade Marketing, Consumer Research and Insights, and Sales, among others.

21. Plaintiff would also need to become an approved vendor/supplier at each retail chain through which it seeks to distribute. Retailers are bombarded with new vendor applications, all of which believe they have the most desirable product. The application process is lengthy and the probability of success extremely low, particularly for a vendor without retail distribution experience.

22. In 2004, Walmart had about 10,000 new suppliers apply to become vendors. These applications are lengthy and require that the company have Universal Product Codes (another application process); complete lengthy questionnaires regarding its manufacturing, promotions, and references; and provide a Dun & Bradstreet report. Of those, only about 200 (or 2%) were ultimately accepted by Walmart. After this acceptance, it can take up to a year to get a first purchase order, and then it can be demanded virtually immediately. Then, 97% of these new products fail, leaving a potential six vendors after the first year. Combined, this gives the Plaintiff an average of 0.06% chance of success through this channel, even given the average new product launch marketing budget of $15 million.

23. If Plaintiff were taking the steps necessary to develop concrete plans for the development of a new product for retail distribution, it would have a range of documents available, including: (i) a 5 Year Strategic Plan reflecting development and distribution of new products for retail; (ii) an Innovation Plan including the pipeline's current status of activity; (iii) a Distribution Plan including channel strategy,

5

transportation, logistics, and warehousing; (iv) a Sales Plan including sales force strategy, periods, and trade deals; (v) a Marketing Plan including brand strategy, communications, and promotions as well as consumer research studies; (vi) Volumetrics Projections for inventory builds, launch, and replenishment; and (vii) Documents Reflecting Meetings, Communications, Applications, and Agreements with suppliers, vendors, distributors, and retailers.

24. Before preparing my report, I asked Kirkland & Ellis to provide those documents described above and I understand that, while they were requested in discovery, they were not produced by Plaintiff.

25. In my experience and expertise, Plaintiff lacks the preparation to enter the retail channel, as it has not taken any of the steps necessary, and lacks the practical ability to do so. In short, the Plaintiff lacks the plans to enter the food products retail market.

**Materials Considered**

26. I reviewed the following documents in forming my opinion: Strategic Planning 2012; Mid-Year Update; Succession Planning (SGNF001003); Calabrese Deposition Transcript; Lopez Deposition Transcript; Complaint for Damages and Other Relief; Plaintiff's Answer to Defendant's Counterclaim; FGF's Answer to Stonefire Grill's Complaint and Counterclaims. I also reviewed other resources and relied on my many years of experience and expertise as a Fortune 500 marketer, agency-leader, professor, and consultant, as well as my education.

Executed on June 12, 2013 at Dallas, Texas.

Rhonda Harper
Rhonda Harper LLC