1
2                                                    O
3
4
5
6               UNITED STATES DISTRICT COURT
7              CENTRAL DISTRICT OF CALIFORNIA
8
9                                          )
10   STONEFIRE GRILL, INC.,                ) Case No.
11                                         ) CV 11-8292 JGB (PJWx)
12                    Plaintiff,           )
13        v.                               )
14   FGF BRANDS, INC.,                     )
15                                         ) **AMENDED ORDER GRANTING**
16                 Defendant. )            **DEFENDANT'S MOTION FOR**
17   _____ )     **SUMMARY JUDGMENT**
18
19   FGF BRANDS, INC.,                     )
20                                         )
21           Counterclaimant,             )
22        v.                               )
23   STONEFIRE GRILL, INC.,                )
24           Counterdefendant. )
25   _____ )
26
27

Before the Court is Defendant FGF Brands, Inc.'s Motion for Summary Judgment. ("Motion," Doc. No. 71.) After considering the papers timely filed and the arguments presented at the July 29, 2013 hearing, the Court GRANTS Defendant's Motion.

## I.   BACKGROUND

**A.   Procedural History**

Plaintiff Stonefire Grill, Inc. ("Plaintiff" or "Stonefire Grill") filed its Complaint on October 6, 2011 against Defendant FGF Brands, Inc. ("Defendant" or "FGF"). (Compl., Doc. No. 1.)  On January 9, 2013, Stonefire Grill filed its First Amended Complaint. ("FAC," Doc. No. 30.)  The FAC states five causes of action for: (1) trademark infringement under 15 U.S.C. § 1114; (2) false designation of origin and unfair competition pursuant to 15 U.S.C. § 1125; (3) state law infringement under Cal. Bus. & Prof. Code § 14245; (4) state law unfair competition pursuant to Cal. Bus & Pof Code § 17200; and (5) cancellation of U.S. Registration No. 4,020,583.  (FAC ¶¶ 30-61.)

On January 22, 2013, Defendant answered the FAC and asserted two counterclaims for: (1) declaratory judgment of no trademark infringement and (2) cancellation of Stonefire Grill's federal trademark

registrations.  (Doc. No. 32.)  Stonefire Grill answered the counterclaims on January 30, 2013.  (Doc. No. 34.)

Plaintiff filed a motion to exclude the expert testimony of James Malackowski on May 20, 2013.  (Doc. No. 40.)  On June 27, 2013, the Court denied Plaintiff's motion.  (Doc. No. 125.)

FGF filed a Motion for Summary Judgment on June 14, 2013.  ("Motion," Doc. No. 71.)  The Motion seeks summary judgment on the grounds that (1) Plaintiff cannot establish a likelihood of confusion, or alternatively that, (2) Plaintiff abandoned its trademark rights through a deceptive naked licensing and policing scheme; (3) Plaintiff's federal marks are void *ab initio* for lack of use in interstate commerce; and (4) Plaintiff cannot recover lost profits because it cannot establish willful infringement.[1]  (Motion at 1.)  Stonefire Grill opposed on June 24, 2013. ("Opp'n," Doc. No. 85.)  On July 1, 2013, FGF replied. ("Reply," Doc. No. 127.)

Initially, the parties filed redacted public versions of their papers and evidence and applied to seal unredacted versions of portions of the same.  On July 10, 2013, the Court denied the parties' applications to seal for failing to identify any

---

[1]  Because the Court finds that Plaintiff has not demonstrated a likelihood of confusion, the Court only reaches the first of these arguments.

3

compelling interest justifying secrecy. (Doc. No.
140.)   The Court noted that it would not consider the
memoranda and evidence submitted under seal in deciding
the Motion.  (Id. at 2.)  Thereafter, the parties filed
corrected versions of portions of their evidence,
including public versions of documents previously-filed
conditionally under seal. (See Doc. Nos. 141, 144,
154, 177.)  Finally, Stonefire Grill again applied to
seal one deposition excerpt, its Statement of Genuine
Disputes of Material Fact, and its Memoranda of Points
and Authorities in support of its Opposition. (Doc.
No. 178.)  The Court granted the application to seal
redacted versions of these three documents on July 23,
2013. (Doc. No. 180.)

Based on the foregoing, the Court considers the
following documents submitted by Defendant in support
of its Motion:

- Memoranda of Points and Authorities ("Motion,"
   Doc. No. 71);

- Statement of Undisputed Facts ("SUF," Doc. No.
   72);

- Declaration of Ojus Amjera ("Amjera Decl.,"
   Doc. No. 75) attaching Exhibits 2, 4, and 5-7[2];

---

[2] Due to the volume of evidence filed in support
of, in opposition to, and in reply to the Motion, the
Court does not enumerate each attached Exhibit, but
describes the documents in subsequent evidentiary
citations as needed.

4

1    • Declaration of Shiana Zalma Ostroff ("Ostroff
2      Decl.," Doc. No. 76) attaching Exhibit 3;
3    • Declaration of Dr. Gerald L. Ford ("Ford
4      Decl.," Doc. No. 77) attaching Exhibits A
5      through D;
6    • Declaration of Rhonda Harper ("Harper Decl.,"
7      Doc. No. 78);
8    • Corrected Declaration of Allison Buchner
9      ("Buchner Decl.," Doc. No 142) attaching
10     Exhibits 1-55[3]; and
11   • Supplemental Declaration of Allison Buchner
12     ("Supp. Buchner Decl.," Doc. No 143) attaching
13     Exhibits 56-60.
14
15   The Court considers the documents below submitted
16 by Stonefire Grill in opposition to the Motion:
17   • Memoranda of Points and Authorities in
18     Opposition ("Opp'n, Doc. No. 85 (public
19     version), Doc. No. 182 (sealed version));
20   • Statement of Genuine Disputes of Material Fact
21     and Additional Undisputed Material Facts
22     ("SGI," Doc. No. 87 (public version), Doc. No.
23     181 (sealed version));
24
25
26   _____
       [3] The Court did not consider any exhibits which
27 were redacted in their entirety.  (See, e.g., Buchner
   Decl., Exhs. 21-25, 46.)

5

1   • Plaintiff's Evidentiary Objections to
2       Defendant's SUF ("Pl. Evid. Obj.," Doc. No.
3       86);
4   • Declaration of Justin Lopez ("Lopez Decl.,"
5       Doc. Nos. 100, 103, 105-123) attaching Exhibits
6       1-6, 8-10, 12-20, and 22-24;
7   • Corrected Declaration of Michael Marchand
8       ("Marchand Decl.," Doc. Nos. 145-153, 155-167,
9       169-176) attaching Exhibits 1-27[4]; and
10  • Notice of Errata Correcting Portions of
11      Declaration of Justin Lopez, Plaintiff's
12      Additional Statement of Undisputed Facts, and
13      Plaintiff's Opposition ("Pl. Corr'n," Doc. No.
14      177).

16  In support of FGF's reply, the Court considers:
17  • Memoranda in Support of Reply ("Reply," Doc.
18      No. 127);
19  • Corrected Declaration of Diana M. Torres
20      ("Torres Decl.," Doc. No. 168) attaching
21      Exhibits 1-4;
22  • Responses to Plaintiff's Evidentiary Objections
23      ("Def. Resp.," Doc. No. 128);
24  • Responses to Additional Facts in Plaintiff's
25      SGI ("Def. SGI," Doc. No. 129); and

26  _____
    [4] The Court granted Stonefire Grill's application
27  to file a redacted version of Exhibit 13 to the
    Marchand Declaration under seal.  (Doc. No. 183.)

1          • Defendant's Evidentiary Objections to
2             Plaintiff's SGI ("Def. Evid. Obj.," Doc. No.
3             130).

4

5      Finally, Stonefire Grill submitted evidentiary
6 objections to the declaration of Diana M. Torres filed
7 in support of FGF's Reply.  ("Pl. Torres Obj.," Doc.
8 No. 136.)

9

10 **B.   First Amended Complaint**

11

12      Stonefire Grill owns a chain of restaurants in
13 Southern California which provide dine-in, pickup,
14 delivery, and catering services.  (FAC ¶¶ 7, 11.)
15 Plaintiff alleges that since 2004 it has been the owner
16 of the marks "Stonefire Grill," a design using the
17 words "Stonefire Grill," and the phrase "Stonefire
18 Grill A Fresh Approach to Family Dining!," which are
19 registered with the United States Patent and Trademark
20 Office ("USPTO") and the State of California.  (FAC ¶¶
21 8-9.)
22      According to the FAC, Defendant sells bread in
23 retail outlets in connection with the word "Stonefire."
24 (FAC ¶¶ 19, 21.)  In August 2011, Defendant registered
25 the mark "Stonefire" with the USPTO.  (FAC ¶ 55.)
26 Plaintiff contends that consumers will mistakenly
27 assume Defendant's bread is connected to Plaintiff

7

because it is a common practice for restaurants to offer food products in retail and wholesale settings. (FAC ¶ 22.)  Moreover, the parties allegedly use similar marketing channels.  (FAC ¶ 23.)  Based on these facts, Plaintiff claims that Defendant violated several state and federal trademark and unfair competition laws as outlined above.

## II.  LEGAL STANDARD[5]

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).

---

[5] Unless otherwise noted, all references to "Rule" refer to the Federal Rules of Civil Procedure.

1        The party moving for summary judgment bears the

2   initial burden of establishing an absence of a genuine

3   issue of material fact.  <u>Celotex</u>, 477 U.S. at 323.

4   This burden may be satisfied by either (1) presenting

5   evidence to negate an essential element of the non-

6   moving party's case; or (2) showing that the non-moving

7   party has failed to sufficiently establish an essential

8   element to the non-moving party's case.  <u>Id.</u> at 322-23.

9   Where the party moving for summary judgment does not

10  bear the burden of proof at trial, it may show that no

11  genuine issue of material fact exists by demonstrating

12  that "there is an absence of evidence to support the

13  non-moving party's case." <u>Id.</u> at 325.  The moving

14  party is not required to produce evidence showing the

15  absence of a genuine issue of material fact, nor is it

16  required to offer evidence negating the non-moving

17  party's claim.  <u>Lujan v. National Wildlife Fed'n</u>, 497

18  U.S. 871, 885 (1990); <u>United Steelworkers v. Phelps</u>

19  <u>Dodge Corp.</u>, 865 F.2d 1539, 1542 (9th Cir. 1989).

20      However, where the moving party bears the burden of

21  proof at trial, the moving party must present

22  compelling evidence in order to obtain summary judgment

23  in its favor.  <u>United States v. One Residential</u>

24  <u>Property at 8110 E. Mohave</u>, 229 F. Supp. 2d 1046, 1047

25  (S.D. Cal. 2002) (citing <u>Torres Vargas v. Santiago</u>

26  <u>Cummings</u>, 149 F.3d 29, 35 (1st Cir. 1998) ("The party

27  who has the burden of proof on a dispositive issue

cannot attain summary judgment unless the evidence that he provides on that issue is conclusive.")).  Failure to meet this burden results in denial of the motion and the Court need not consider the non-moving party's evidence.  One Residential Property at 8110 E. Mohave, 229 F. Supp. 2d at 1048.

Once the moving party meets the requirements of Rule 56, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 256.  The non-moving party does not meet this burden by showing "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The United States Supreme Court has held that "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient."  Anderson, 477 U.S. at 252.  Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id. at 250.  When ruling on a summary judgment motion, the Court must examine all the evidence in the light most favorable to the non-moving party.  Celotex, 477 U.S. at 325.  The Court cannot engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the jury.  Anderson, 477

U.S. at 255.  Without specific facts to support the conclusion, a bald assertion of the "ultimate fact" is insufficient.  See Schneider v. TRW, Inc., 938 F.2d 986, 990-91 (9th Cir. 1991).

### III. FACTS

**A.   Preliminary Matters**

The Court initially notes that many of the depositions Plaintiff presented to the Court are illegible and therefore in violation of Local Rules 11-3.1 and 11-4.1.  (See Marchand Decl., Exhs. 6, 10-12.) The electronically filed copies on the docket and those provided as mandatory chambers copies are in miniscule type and printed so lightly as to be nearly, or in many cases, totally unreadable.  Moreover, by printing four pages of a deposition transcript on each 8 1/2 by 11 sheet, Plaintiff fails to comply with Local Rules 11-3.1.1 and 11-3.2.  Given the illegibility of much of Plaintiff's evidence, the Court relies on the deposition transcripts provided by Defendant where possible.

**B.   Evidentiary Objections**

In support of its Motion, FGF put forth 215 undisputed facts. (<u>See</u> SUF.)  Stonefire Grill objects to every single fact. (<u>See</u> Pl. Evid. Obj.)  In support of its opposition, Stonefire Grill submitted 144 undisputed facts. (<u>See</u> SGI.)  FGF objects to 91 of those facts. (<u>See</u> Def. Evid. Obj.)  For many of the facts, the parties object on multiple grounds.

All of the parties' objections are "boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence." <u>Doe v. Starbucks, Inc.</u>, No. 08-0582, 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009).  On this basis alone, the Court will not scrutinize each objection and give a full analysis of identical objections raised as to each fact. <u>See also Capitol Records, LLC v. BlueBeat, Inc.</u>, 765 F. Supp. 2d 1198, 1200 n.1 (C.D. Cal. 2010) (quotation omitted) (On motions with voluminous objections "it is often unnecessary and impractical for a court to methodically scrutinize each objection and give a full analysis of each argument raised.").[6]

---

[6] As to nearly every fact Defendant proffers, Plaintiff asserts a blanket "lacks foundation" objection. (See Pl. Evid. Obj. ¶¶ 13, 15-16, 18, 22-28, 30-53, 55-62, 64-174, 176-203, 204-209, 210-215.) Plaintiff does not provide any supporting citation, evidence, or argument.  Because the Court is unable and unwilling to guess at the meaning or intent of
(continued . . .)

1    As to every fact proffered by FGF, Stonefire Grill

2 argues that it is irrelevant and/or an improper legal

3 conclusion.  (<u>See, e.g.</u>, Pl. Evid. Obj. ¶¶ 6, 15, 30,

4 55.)  "Objections to evidence on the ground that it is

5 irrelevant, speculative, and/or argumentative, or that

6 it constitutes an improper legal conclusion are all

7 duplicative of the summary judgment standard itself"

8 and are thus "redundant" and unnecessary to consider

9 here.  <u>Burch v. Regents of Univ. of California</u>, 433 F.

10 Supp. 2d 1110, 1119 (E.D. Cal. 2006); see <u>Anderson</u>, 477

11 U.S. at 248 ("Factual disputes that are irrelevant or

12 unnecessary will not be counted.").  Thus, the Court

13 does not rule on any of FGF's relevance objections.

14    Similarly, the Court will not consider the parties'

15 objections aimed at the characterization of or

16 purported misstatement of the evidence as represented

17 in the SUF and SGI.  (<u>See, e.g.</u>, Def. Evid. Obj. ¶¶ 24,

18 34, 68 ("misleading"); Pl. Evid. Obj. ¶¶ 55, 71, 95

19 ("mischaracterizes evidence"); <u>id.</u> ¶ 14 ("misstates

20 facts in evidence").)  The parties' "'evidentiary

21 objections' to [their adversary's] separate statements

22 of undisputed facts are not considered because such

23 _____

24    ( . . . continued)
Plaintiff's foundation objections, the Court does not

25 rule on them.  To the extent that the Court relies on
the challenged evidence, the court finds that the

26 testimony is sufficiently grounded in personal
knowledge gained through personal experience,

27 investigation, or review of documents maintained in the
course of Defendant's business.

13

objections should be directed at the evidence
supporting those statements." Hanger Prosthetics &
Orthotics, Inc. v. Capstone Orthopedic, Inc., 556 F.
Supp. 2d 1122, 1126 (E.D. Cal. 2008); Dalton v.
Straumann Co. USA Inc., No. 99-4579, 2001 WL 590038, at
*4 (N.D. Cal. May 18, 2001) ("Most of these objections
to evidence are actually objections to defendant's
characterization of the evidence in its 'Statement of
Undisputed Facts.' Plaintiff's counsel objects that
statements are vague or compound as if he were
objecting to questions asked in a deposition. But
counsel is not objecting to evidence, merely to
defendant's characterization of the evidence."). For
these reasons, the Court does not consider objections
aimed at the opposing parties' characterization of the
evidence, including that the fact misleads, misstates,
or mischaracterizes the evidence.

Disregarding these improper objections, the Court
addresses the remaining substantive objections raised
by the parties.

**1. Best Evidence Rule**

Stonefire Grill brings several of its remaining
objections under the best evidence rule. Fed. R. Evid.
1002, 1003. Plaintiff clearly misunderstands the
purpose and application of this rule. Rule 1002 states
that "[a]n original writing, recording, or photograph
is required in order to prove its content . . . ."

Fed. R. Evid. 1002.  In many cases, Plaintiff's best evidence objections ignore that the objected-to testimony does not purport to offer the contents of a document.  (See, e.g., Pl. Evid. Obj. ¶¶ 6, 12, 43, 127.)  Plaintiff also objects on best evidence grounds even when Defendant directly cites the documentary evidence quoted or referenced.  (See, e.g., 47 52, 75, 124.)  Accordingly, the Court finds that Plaintiff's best evidence objections are unfounded and OVERRULED.

## 2.  Privileged Settlement Communications

Plaintiff objects to Defendant's reliance on a lawsuit settlement, draft and final license agreements, and cease-and-desist letters and the communications and actions stemming therefrom.  Plaintiff argues that Defendant's use of this evidence is barred by Federal Rule of Evidence 408 as privileged settlement communications which cannot be used to prove the validity of a disputed claim.  (Pl. Evid. Obj ¶¶ 122-131, 133-135, 140-141, 145-151, 153-154.)  Confusingly, Plaintiff refutes its own privilege argument by relying on the exact same evidence in its opposition and additional material facts.  (SGI ¶¶ 63-85.)  However, the Advisory Committee notes to the 2006 Amendment make clear that "Rule 408 excludes compromise evidence even when a party seeks to admit its own settlement offer or statements made in settlement negotiations."  Fed. R. Evid. 408, Advisory Committee notes to 2006 Amendment.

1    Construing the facts in the light most favorable to
2  Plaintiff,[7] the Court finds that the proffered evidence
3  wherein Plaintiff offered licenses, sent cease-and-
4  desist letters, settled a lawsuit, and interacted, or
5  failed to interact, with alleged infringers in pursuit
6  of license agreements constitutes "conduct or
7  statement[s] made during compromise negotiations."
8  Fed. R. Evid. 808(a)(2).  Contrary to Defendant's
9  argument, Rule 408 does not only shield settlement
10 communications when they are offered to prove or
11 disprove liability for the claims resolved by those
12 settlements.  (Reply at 9.)  In fact, binding case law
13 and the policy underlying the rule indicate the
14 opposite, "Rule 408 does apply to situations where the
15 party seeking to introduce evidence of a compromise was
16 not involved in the original compromise."  Hudspeth v.
17 C.I.R., 914 F.2d 1207, 1213 (9th Cir. 1990); see also
18 Green v. Baca, 226 F.R.D. 624, 640 (C.D. Cal. 2005)
19 ("The [Rule 408] prohibition extends to evidence of
20 completed settlements in other cases where the evidence
21 is offered against the compromiser.").  Pursuant to the
22 public policy underlying the rule, evidence of
23 Plaintiff's compromise negotiations must be excluded in

24  _____
25    [7] The parties disagree over whether Plaintiff's
   April 2011 communications with StoneFire Pizza Company,
26 Inc. constituted the creation of a license agreement,
   as Defendant contends, or merely constituted a
27 settlement offer, as Plaintiff contends.  (See, e.g.,
   SUF ¶ 123; SGI ¶ 123.)

order to promote settlement and protect the interests of the other parties to the compromise.  See McDevitt v. Guenther, 522 F. Supp. 2d 1272, 1285 (D. Haw. 2007) (refusing to allow admission of Plaintiff's prior settlement with a non-party in order to protect the compromising party).  Accordingly, the Court SUSTAINS Plaintiff's Rule 408 objections and does not rely on this evidence to determine the validity of the trademark claim.[8]

### 3.  Lopez Declaration

Throughout its statement of additional undisputed facts, Plaintiff relies on the declaration of Justin Lopez, Stonefire Grill's Director of Marketing.  (Lopez Decl. ¶ 1.)  Defendant objects to many portions of Lopez's declaration and the attached exhibits under Rule 602 due to lack of foundation.  (See, e.g., Def. Evid. Obj. ¶¶ 6-8, 13, 24, 26-28, 31, 35-36, 40-41, 45-46, 53, 55, 57.)  Defendant's lack of foundation objections take three forms: (1) Lopez was not a Stonefire Grill employee at the time of the alleged fact, (2) Lopez's declaration testimony states a fact, but in his depositions Lopez, on behalf of himself or Stonefire Grill, stated he lacked knowledge, and (3)

---

[8]  Insofar as Defendant relies on this evidence to prove that Plaintiff engaged in naked licensing enforcement activities which resulted in Plaintiff's abandonment of its trademark, the Court does not reach the issue of naked licensing and therefore does not determine whether the evidence would be admissible for that purpose.

1  testimony in Lopez's declaration contradicts testimony

2  he provided during his deposition as a percipient

3  witness or as a Plaintiff's Rule 30(b)(6)

4  representative.

5      As to the first type of objection, the Court

6  recognizes that Lopez testified both as percipient

7  witness and as the person most knowledgeable for

8  Stonefire Grill.  Accordingly, Lopez's personal

9  knowledge can be inferred from his position within the

10 company.  See In re Kaypro, 218 F.3d 1070, 1075 (9th

11 Cir. 2000) ("Personal knowledge may be inferred from a

12 declarant's position.") (citation omitted).  It can be

13 inferred that Lopez has knowledge of the corporation's

14 present and past activities, including its 2002 name

15 change, use of the word "Stonefire," and corporate

16 earnings.  See Barthelemy v. Air Lines Pilots Ass'n,

17 897 F.2d 999, 1018 (9th Cir. 1990) (concluding that a

18 CEO's personal knowledge of various corporate

19 activities could be presumed); Los Angeles Times

20 Commc'ns, LLC v. Dep't of Army, 442 F. Supp. 2d 880,

21 886 (C.D. Cal. 2006) ("[D]eclarant can testify about

22 practices or procedures in place before the witness was

23 employed with the organization about which he is

24 relating information.").  The Court therefore finds

25 that, for purposes of summary judgment, Lopez has

26 personal knowledge of Plaintiff's corporate activities

27 prior to his employment.

1    Both the second and third objections invoke the
2  sham affidavit rule.  "The general rule in the Ninth
3  Circuit is that a party cannot create an issue of fact
4  by an affidavit contradicting his prior deposition
5  testimony."  Kennedy v. Allied Mut. Ins. Co., 952 F.2d
6  262, 266 (9th Cir. 1991).  However, "the inconsistency
7  between a party's deposition testimony and subsequent
8  affidavit must be clear and unambiguous to justify
9  striking the affidavit."  Van Asdale v. Int'l Game
10 Tech., 577 F.3d 989, 998-99 (9th Cir. 2009).  A "non-
11 moving party is not precluded from elaborating upon,
12 explaining or clarifying prior testimony elicited by
13 opposing counsel on deposition and minor
14 inconsistencies that result from an honest discrepancy,
15 a mistake, or newly discovered evidence afford no basis
16 for excluding an opposition affidavit."  Id. at 999
17 (quoting Messick v. Horizon Indus., 62 F.3d 1227, 1231
18 (9th Cir. 1995)).
19    In the present case, Lopez's declaration does not
20 directly contradict his prior testimony.  In most
21 instances, Lopez responded that he did not know the
22 answer to questions posed by Defendant's counsel, but
23 in his declaration he provides an affirmative answer.
24 (See, e.g., Def. Evid. Obj. ¶¶ 13, 31, 45.)  This
25 circumstance is clearly permissible as a declarant may
26 subsequently elaborate on or clarify his prior
27 testimony.  See Legal Aid Servs. of Or. v. Legal Servs.

Corp., 561 F. Supp. 2d 1187, 1203 (D. Or. 2008) <u>aff'd sub nom.</u> Legal Aid Servs. of Oregon v. Legal Servs. Corp., 608 F.3d 1084 (9th Cir. 2010) (rejecting the plaintiff's argument that "portions of the Freedman Declaration . . . are irreconcilable with Freedman's prior deposition testimony that LSC lacked information as to how LASO and OLC allocated their collective resources"). Lopez's lack of information during his depositions does not render his subsequent declaration a sham. Moreover, the few instances Defendant identifies where Lopez's declaration modifies his prior deposition testimony are not sufficient to make his declaration a sham.[9] The Court finds that the Lopez declaration is not a sham and OVERRULES Defendant's lack of foundation objections to his affidavit.[10]

### 4. Examples of Alleged Confusion

As described in full below, Plaintiff relies on a handful of examples where members of the public were purportedly confused about the source of FGF's

---

[9] Most of the alleged contradictions involve an incorrect date (Def. Evid. Obj. ¶ 40) or a partial response which Lopez elucidated in his declaration (Def. Evid. Obj. ¶¶ 35, 41).
[10] The Court does not reach Defendant's argument that Plaintiff abandoned its trademarks by engaging in naked licensing and therefore does not decide whether the Lopez declaration could be considered a sham for that purpose. (Def. Evid. Obj. ¶¶ 63-76, 78-80, 82-85.)

products.  Defendant objects to five of these instances on hearsay grounds.[11]

At the summary judgment stage, the Court does "not focus on the admissibility of the evidence's form," but rather on the admissibility of its contents.  Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003).  Thus, if the contents of objected-to evidence could be presented in an admissible form at trial, the Court may consider it in deciding the summary judgment motions.  Id. at 1037; Norse v. City of Santa Cruz, 629 F.3d 966, 973 (9th Cir. 2010) ("[T]he evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial.").  However, the Court may not consider inadmissible hearsay evidence which could not be presented in an admissible form at trial.  See Medina v. Multaler, Inc., 547 F. Supp. 2d 1099, 1122 (C.D. Cal. 2007) ("Medina bases much of her declaration on hearsay evidence that will not be admissible at trial.  Medina will not, for

_____

[11]  Defendant also objects to all eight of the examples of confusion under Federal Rule of Evidence 602 for lack of foundation.  Lopez's position as Director of Marketing is adequate foundation to establish that he received the internet and social media messages.  (Def. Evid. Obj. ¶¶ 53, 55, 57.)  Similarly, the deposition testimony of the hearers of the confusion statements lays an adequate foundation for the introduction of these statements into evidence.  (Def. Evid. Obj. ¶¶ 58, 60, 61, 62.)  Cf. R & R Partners, Inc. v. Tovar, 447 F. Supp. 2d 1141, 1154 (D. Nev. 2006) ("The court agrees with LVCVA that a proper foundation has been laid in order to show the effect the statements may have had on Mr. Vassiliadis and his possible belief that people are actually confused.").

example, be able to take the witness stand at trial and recount statements that constitute hearsay, double hearsay, or triple hearsay.").

As presented, the instances of alleged confusion present multiple layers of hearsay. For example, in Justin Lopez's declaration, he states that a Stonefire Grill employee reported that her partner's employer stated to her partner that "I didn't know that Stonefire was in the supermarkets." (Deposition of Justin Lopez ("Lopez Depo.") 148:2-152:22, Buchner Decl., Exh. 19.)

First, statements of direct confusion, such as this, are clearly offered for the truth of the matter. See Lahoti v. Vericheck, Inc., 636 F.3d 501, 509 (9th Cir. 2011).

Second, in this example, there is no declarant who could take the stand at trial and testify to this instance of alleged confusion without implicating multiple layers of hearsay. Neither Lopez, nor the Stonefire Grill employee would have first- or even second-hand knowledge of the statement and both the declarant (partner's employer) and the hearer (employee's partner) are unidentified. Thus, the contents are not admissible in any form unless an exception applies.

The Ninth Circuit has recognized that the original statement is permissible under the "state of mind"

22

exception to the hearsay rule.  Fed. R. Evid. 803(3); see Lahoti, 636 F.3d at 509.  The assertion represents the declarant's then-existing state of mind at the time the statement was made.  However, no exception applies to the multiple layers of hearsay between the partner and an available witness.  Accordingly, this instance of alleged confusion must be excluded as hearsay.  See R & R Partners, Inc. v. Tovar, 447 F. Supp. 2d 1141, 1154 (D. Nev. 2006) ("[E]vidence as to what the client may have said is inadmissible hearsay for purposes of proving that the client was actually confused.").

As to the four remaining examples of confusion objected-to on hearsay grounds, the declarant's original assertion is excepted from the hearsay rule under Rule 803(3).  However, in these examples, the hearers are Stonefire Grill executives who are available to testify at trial.  (Def. Evid. Obj. ¶¶ 58, 60, 61, 62.)  The content of these statements are admissible at trial; therefore, their form need not be considered on summary judgment.  Fraser, 342 F.3d at 1036.  For the reasons discussed, the Court OVERRULES Defendant's hearsay objections numbered 58, 60, 61, 62 and SUSTAINS Defendant's objection number 59.

**5.  The Experts**

In support of its Motion, Defendant produced two experts.  Dr. Gerald Ford designed and conducted a survey to address the issue of likelihood of confusion.

(Ford Decl.)  Ms. Rhonda Harper, an experienced marketing professional, provided opinions on the likelihood of confusion and the likelihood of expansion.  (Harper Decl.)  In opposition, Plaintiff also supplied two experts.  Dr. Jabob Jacoby reviewed and provided an evaluation of Dr. Ford's likelihood of confusion study.  (Rebuttal Report of Jacob Jacoby, Ph.D. ("Jacoby Report"), Marchand Decl., Exh. 21.)  Mr. Chris Tripoli provided an expert report on the industry trend of restaurants bringing their products to retail markets.  (Expert Report of Mr. Chris Tripoli ("Tripoli Report"), Marchand Decl., Exh. 23.)

### a.  Defendant's Experts

Plaintiff attacks Dr. Ford's expert report as unreliable under Federal Rules of Evidence 702 and 703. (Pl. Evid. Obj. ¶¶ 175-180.)  Plaintiff provides no analysis or explanation for its objection to Dr. Ford, but the Court surmises that Plaintiff believes Dr. Ford's survey is inadmissible due to the critiques of the survey discussed in Dr. Jacoby's report.  As reiterated by the Ninth Circuit in Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025 (9th Cir. 2010), "survey evidence should be admitted as long as it is conducted according to accepted principles and is relevant."  Id. at 1037 (citation and quotation omitted).  The Court initially notes that numerous courts in the Ninth Circuit have

found trademark confusion surveys conducted by Dr. Ford to be reliable and admissible.  See, e.g., adidas-Am., Inc. v. Payless Shoesource, Inc., 546 F. Supp. 2d 1029, 1045 (D. Or. 2008); E & J Gallo Winery v. Proximo Spirits, Inc., 1:10-CV-00411 LJO, 2011 WL 5922090, at *7 (E.D. Cal. Nov. 28, 2011).  The Court finds that Dr. Ford conducted his survey according to accepted principles.  The survey showed photographs of SAFs to a population of 310 adults who did most of the grocery shopping and were likely to purchase flatbread, two-thirds of whom were in California, and asked a series of questions related to confusion.  (Ford Decl. ¶¶ 3-6.)  It employed a double-blind protocol and used survey questions similar to those generally accepted in confusion surveys.  See E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1292 (9th Cir. 1992) (admitting a confusion survey with questions similar to those presented in Dr. Ford's survey).  Dr. Jacoby's critiques of the survey on the basis of the test protocol used, the universe defined and tested, and the questions asked go to the weight, not the admissibility of the survey.  See id. at 1293 ("[A]ny technical unreliability goes to weight, not admissibility."); Wendt v. Host Int'l, Inc., 125 F.3d 806, 814 (9th Cir. 1997) ("Challenges to survey methodology go to the weight given the survey, not its admissibility.").  The

1  Court therefore OVERRULES Plaintiff's objections to Dr.

2  Ford's survey and declaration.

3      Plaintiff also objects to the declaration of Rhonda

4  Harper on the grounds that her testimony is improper

5  expert opinion.  As an expert witness, Ms. Harper may

6  testify to an opinion that requires specialized

7  knowledge using specific facts or data applied using

8  reliable principles and methods to help a factfinder

9  determine a fact at issue.  Fed. R. Evid. 702.  Ms.

10 Harper has specialized knowledge in brand marketing,

11 new product development, production, and merchandising

12 for companies in numerous fields, including food and

13 restaurants.  (Harper Decl. ¶¶ 2-9.)  She relied on

14 specific facts regarding the process for bringing a

15 food product from conception to retail in order to

16 reach the conclusion that "Plaintiff lacks preparation

17 to enter the retail channel."  (Id. ¶ 25.)  The Court

18 finds that Ms. Harper's expert testimony meets the

19 standard under Rule 702 and therefore OVERRULES

20 Plaintiff's objections and admits the declaration.

21         b.   Plaintiff's Experts

22      Defendant seeks to exclude the report of Dr. Jacoby

23 on several grounds, all of which the Court finds

24 unavailing.  Dr. Jacoby relies on over twenty years of

25 experience as a consumer research scholar to reach

26 opinions based on the facts of this matter and after

27 reviewing Dr. Ford's survey.  His testimony therefore

is proper expert opinion testimony under Federal Rule of Evidence 702.  Moreover, an expert report sworn under penalty of perjury is admissible and need not be attached to the expert's declaration.  Cf. Fowle v. C & C Cola, 868 F.2d 59, 67 (3d Cir. 1989) (expert's report attached to the declaration of plaintiff's counsel does not comply with Rule 56(e), since "[t]he substance of th[e] report was not sworn to by the alleged expert").  Although the report may be hearsay, Dr. Jacoby could testify to all the relevant portions of his report from personal knowledge, Fed. R. Evid. 602, or at the very least use the report to refresh his recollection, Fed. R. Evid. 612.  See Marceau v. Int'l Bhd. of Elec. Workers, 618 F. Supp. 2d 1127, 1143 (D. Ariz. 2009). The Court OVERRULES Defendant's objections to Dr. Jacoby's rebuttal report.

    The testimony and report of Mr. Chris Tripoli present a closer case.  Mr. Tripoli is the President of a restaurant consulting firm whose primary business activities include providing advice on market feasibility, menu research, marketing, and growth strategies to restaurants.  (Tripoli Decl. at 1.)  Mr. Tripoli has never before testified on the primary subjects on which he opines here, that is, restaurant and grocery store competition or restaurants bringing their items into retail chains.  (Deposition of Chris Tripoli ("Tripoli Depo.") 176:5-177:3, Marchand Decl.,

Exh. 18.)  Mr. Tripoli admits he has worked with only a few grocery stores (Tripoli Depo. 187:16-21), and he has given presentations to restaurant industry professionals which tangentially relate to these issues (Id. 186:3-7; 108:22-111:4), but he has never written about them (Id. 107:1-4).  As such, these facts raise substantial questions regarding whether Mr. Tripoli has "a reliable basis in the knowledge and experience of [the relevant] discipline."  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 (1993). Moreover, Mr. Tripoli's testimony reveals that many of the conclusions in his report are unreliable or immaterial.  He admits that some of the data supplied in his report has not been validated (Tripoli Depo. 249:3-11) and other information is irrelevant (Id. 252:5-10; 253:6-254:16).  Finally, most of Tripoli's report is a summary of inadmissible facts, as opposed to expert opinion.  "[A]n expert report cannot be used to prove the existence of facts set forth therein."  In re Citric Acid Litig., 191 F.3d 1090, 1102 (9th Cir. 1999).  Tripoli lacks personal knowledge for most of the facts in his report and therefore could not testify to them to prove the truth of the matter.  Once these inadmissible facts are excluded, there are very few opinions remaining which would require "enlightenment from those having a specialized understanding of the subject involved in the dispute."  Fortune Dynamic, 618

F.3d at 1041 (citation and quotation omitted).  For all of these reasons, the Court SUSTAINS Defendant's objections to Tripoli's report and deposition testimony (Def. Evid. Obj. ¶¶ 113-134) and does not consider this evidence.

## C.  Disputed and Undisputed Facts

Despite the multitude of evidentiary objections, the parties primarily agree on the most of the facts that the Court finds relevant to the outcome of this action.  Except as noted, the following material facts are sufficiently supported by admissible evidence and are uncontroverted.  They are "admitted to exist without controversy" for purposes of the Motion.  L.R. 56-3 (facts not "controverted by declaration or other written evidence" are assumed to exist without controversy); Fed. R. Civ. P. 56(e)(2) (stating that where a party fails to address another party's assertion of fact properly, the court may "consider the fact undisputed for purposes of the motion").  Any facts the Court finds disputed are clearly marked as such.  The Court does not rely on any fact or evidence beyond that stated below.

### 1.  Defendant FGF

FGF is a Canadian corporation founded in 2004 by the Amjera family. (SUF ¶ 2; SGI ¶ 2.)  In 2006, FGF

1   began producing and selling flatbreads.  (SUF ¶ 3; SGI

2   ¶ 3.)

3        Originally, FGF sold flatbreads under the name

4   "Fabulous Flats" or unbranded to retailers.  (SUF ¶ 4;

5   SGI ¶ 4.)  In 2009, FGF hired an outside agency to

6   rebrand the flatbreads, including determining a new

7   brand name.  (SUF ¶ 5; SGI ¶ 5.)  The rebranding

8   process included a presentation of potential brand

9   names and focus groups to gauge consumer response to

10  prospective names.  (SUF ¶¶ 7, 8; SGI ¶¶ 7, 8.)  No

11  participants in the focus groups mentioned Plaintiff.

12  (Amjera Decl. ¶ 13.)[12]  In 2010, FGF hired a trademark

13  attorney to conduct a trademark search to determine the

14  availability of the "Stonefire" mark.  (SUF ¶ 10; SGI ¶

15  10.)  The search revealed that Plaintiff registered the

16  "Stonefire Grill" mark and design mark with the USPTO

17  for use in connection with restaurant services.

18  ("Trademark Search Report," Amjera Decl., Exh. 4.)  The

19  search also revealed many other uses of the word

20  "Stonefire" in connection with restaurant services.

21

22  _____

23        [12] Plaintiff objects to this fact on hearsay
    grounds.  (Pl. Evid. Obj. ¶ 9.)  The Court OVERRULES

24  this objection because, as discussed above, on summary
    judgment the Court is concerned with the evidence's

25  content, not its form.  <u>Fraser</u>, 342 F.3d at 1036.
    Here, Amjera, as head of the marketing department, has

26  personal knowledge of the focus groups and their
    results.  (Amjera Decl. ¶¶ 1, 13.)  At trial, he could

27  testify to the objected-to evidence without running
    afoul of the hearsay rules.

1   Many of these registrations were abandoned.  (Id.)[13]   In

2   2011, FGF applied for and, on August 30, 2011, was

3   granted a federal trademark (Reg. No. 4,020,583) for

4   the word "Stonefire" in connection with foodstuffs,

5   specifically flatbread.  (SUF ¶ 17; SGI ¶ 17.)

6       In March 2011, FGF launched its Stonefire Authentic

7   Flatbread ("SAF") brand, which includes naan, pita,

8   roti, and pizza crust.  (SUF ¶ 19; SGI ¶ 19.)

9   Currently, SAFs are sold in over 22,000 retail markets

10  in the United States and Canada, and sell for

11  approximately $2.49 to $2.99 per individual package.

12  (SUF ¶ 20; SGI ¶ 20; SGI ¶ 95; Def. SGI ¶ 95.)   The SAF

13  logo, as described below, appears on the packaging of

14  all SAF products.  (SGI ¶ 97; Def. SGI ¶ 97.)

15      FGF sells its SAF to consumers primarily through

16  retail supermarkets and club stores.  (30(b)(6)

17  Deposition of Ojus Amjera ("Amjera 30(b)(6) Depo.")

18  50:21-51:5, Marchand Decl., Exh. 7.)  FGF does not sell

19

20      [13] Curiously, Plaintiff objects to the trademark
    search report insofar as it lists other registrations
21  for the word "Stonefire," but not as it relates to
    Plaintiff's registration of the word.  (Pl. Evid. Obj.
22  ¶ 13.)  Regardless, the Court finds that the Trademark
    Search Report is admissible non-hearsay.  Defendant
23  relies on the Report to prove the effect of the report
    on the listener, i.e. to show it had notice of the
24  purported registrations.  Accordingly, Plaintiff's
    objection is OVERRULLED as this use of the Trademark
25  Search Report does not fall within the definition of
    hearsay and is admissible evidence.  See Saul Zaentz
26  Co. v. Wozniak Travel, Inc., 627 F. Supp. 2d 1096, 1113
    (N.D. Cal. 2008) (finding that a trademark search
27  report was not hearsay because it was used to show
    notice to the plaintiff).

directly to restaurant customers, but it does sell some SAF products to food service distributors, mostly in an unbranded form.  (Id. 52:1-7; Deposition of Ojus Amjera ("Amjera Depo.") 13:21-14:23, Marchand Decl., Exh. 8.)

## 2.  Plaintiff Stonefire Grill

Stonefire Grill,[14] originally named Wildfire Grill, opened its first location in 2000 and currently owns and operates seven "fast casual" restaurants in Southern California.  (SUF ¶ 31; SGI ¶ 31; SGI ¶ 1; Def. SGI ¶ 1.)  From 2000 to 2010, Plaintiff opened approximately one new location per year, but has never operated a restaurant outside this region.  (SUF ¶ 33; SGI ¶ 33; SGI ¶ 11; Def. SGI ¶ 11.)  The restaurants offer pizzas, sandwiches, salads, soups, and various meat and fish dishes.  (SGI ¶ 3; Def. SGI ¶ 3.)  The entrees at Stonefire Grill restaurants sell for approximately $8.00 to $15.00 per item, while side dishes range from $4.00 to $6.00.  (SGI ¶ 33; Def. SGI ¶ 33.)  Plaintiff serves approximately 3.5 million customers per year and offers dine-in, take-out, catering services, and in 2010 began selling gift cards on its website.  (SUF ¶ 34; SGI ¶ 34; SGI ¶ 2; Def. SGI ¶ 2; SUF ¶ 71; SGI ¶ 71.)  The majority of Stonefire

---

[14] For ease of reading, the Court uses the term Stonefire Grill to refer to all of its prior names and entities, including Wildfire Grill, Wildfire Grill, Inc., Stonefire Grill, Inc., and Stonefire Grill 1, Inc.

Grill's customers are located in Southern California.
(SGI ¶ 137; Def. SGI ¶ 137; SUF ¶ 73; SGI ¶ 73.)[15]

In December 2002, Plaintiff began using the name
"Stonefire Grill" in connection with its restaurant
services and currently displays the name and logo on
its restaurants, marketing, and advertising.  (SGI ¶¶
7-8; Def. SGI ¶¶ 7-8.)  Plaintiff refers to a select
number of menu items and services using the word
"stonefire," such as "Stonefire's BBQ Beef,"
"Stonefire's Catering," and "Stonefire's Grilled
Vegetables."  (Lopez Decl. ¶ 13.)

Plaintiff filed an intent-to-use the trademark
"Stonefire Grill" with the USPTO on November 6, 2002.
(SUF ¶¶ 43, 47; SGI ¶ 43, 47.)  On May 13, 2004,
Stonefire Grill filed its Statement of Use for the
"Stonefire Grill" word mark.  (SUF ¶ 48; SGI ¶ 48.)  On
August 31, 2004, the USPTO issued Plaintiff a
registration for the word mark "Stonefire Grill" (Reg.
No. 2,880,327) for restaurant services.  (SUF ¶ 50; SGI
¶ 50.)  Plaintiff's registrations for the design marks
"Stonefire Grill A Fresh Approach to Family Dining"
(Reg. No. 3,716,355) and "Stonefire Grill" in a

---

[15] Plaintiff points out that out-of-state tourists
may also visit the restaurants or purchase gift cards
online.  (Lopez Decl. ¶¶ 4, 65.)  Aside from
speculation regarding customer origins, Plaintiff only
identifies 100 out-of-state gift-card purchasers.  (SGI
¶ 15; Def. SGI ¶ 15.) However, such evidence does not
change the undisputed fact that a majority of its
customers are located in Southern California.

distinctive typeface (Reg. No. 3,716,351) both for use
with restaurant and bar services issued in 2009. (SUF
¶¶ 51-52; SGI ¶¶ 51-52.) Plaintiff also holds three
California trademark registrations for bar and
restaurant services for these marks. (SUF ¶ 54; SGI ¶
54.)

Since Plaintiff began using the name Stonefire
Grill in 2002, Plaintiff's revenue figures have risen
from $3.5 million in 2002 to $42 million in 2012.
(Lopez Decl. ¶¶ 16-17.)

### 3.  The Marks

As mentioned above, Plaintiff owns three trademarks
(collectively, "SG Marks"). The first is a word mark
for the phrases "Stonefire Grill" used in connection
with restaurant and bar services. ("SG Word Mark,"
Buchner Decl., Exh 16.) The second and third are
design marks with the words "Stonefire Grill" in all
capital letters against a white background; the word
"Stonefire" utilizes a font wherein the letters appear
to be on fire and the word "grill" is underneath in a
block-letter typeface. ("SG Logo," Buchner Decl., Exh.
18.) The third includes the above design with the
tagline "A Fresh Approach to Family Dining" in small
caps underneath. (Buchner Decl., Exh. 17.)

FGF's trademark is a word mark for the single word
"Stonefire." ("FGF Mark," Buchner Decl., Exh. 3.)
FGF's logo for SAF is not trademarked, but it features

the word "Stonefire" in white scripted letters with a capitalized "s" and a prominent "f" on a rust-colored background with a graphic of orange-colored fire in a sphere above the "n" in Stonefire. ("SAF Logo," see Marchand Decl., Exh. 8.) Underneath the word "Stonefire" is the phrase "authentic flatbreads" in a smaller capitalized block font. (Id.)

### 4. Plaintiff's Expansion Plans

Plaintiff claims it has plans to open additional restaurant locations in California and elsewhere and to offer retail products designed to be sold in grocery stores. (SUF ¶ 75; SGI ¶ 75.) However, Plaintiff has taken no steps toward its plan of opening restaurants in other states. Plaintiff has not reviewed any proposals or identified, scouted, or visited any locations outside of California where it plans to open a restaurant. (SUF ¶¶ 76-78; SGI ¶¶ 76-78.) It also has not investigated the required licenses, permits, or incorporation process for operating a non-California restaurant. (SUF ¶¶ 82-83; SGI ¶¶ 82-83.) In the short term, Plaintiff plans to open one restaurant in Southern California by the end of 2013. (30(b)(6) Deposition of Justin Lopez ("Lopez 30(b)(6) Depo.") 59:10-25, Buchner Decl., Exh. 12.) Plaintiff's website states, however, that it is "a Southern California-based restaurant group and . . . we are not currently expanding." (SUF ¶ 80; SGI ¶ 80.)

1  In addition, Plaintiff has not taken any concrete

2  steps toward its goal of selling products in retail

3  stores.  First, Plaintiff does not have any products to

4  sell, other than gift cards to its restaurants.  (SUF ¶

5  110; SGI ¶ 110.)  At this time, Plaintiff has not taken

6  any specific steps toward identifying or finding

7  products to sell, as it has not: made contact with

8  buyers at grocery stores or retail establishments (SUF

9  ¶ 94; SGI ¶ 94), investigated licensing or vendor

10  requirements (SUF ¶ 95; SGI ¶ 95), developed a

11  marketing strategy (SUF ¶ 97; SGI ¶ 97), developed a

12  sales or distribution strategy (SUF ¶ 98; SGI ¶ 98),

13  determined pricing (SUF ¶ 99; SGI ¶ 99), created

14  packaging (SUF ¶ 101; SGI ¶ 101), hired a consultant or

15  expert (SUF ¶ 102; SGI ¶ 102), investigated the cost to

16  manufacture or ship products (SUF ¶ 117; SGI ¶ 117), or

17  entered any agreements with licensees (SUF ¶ 100; SGI ¶

18  100) in order to sell products at retail stores.

19  Plaintiff's search for these opportunities has remained

20  the same for the last several years.  (Deposition of

21  Kaduri Shemtov ("Shemtov Depo.") 124:10-18, Buchner

22  Decl., Exh. 6.)  Plaintiff's co-founder admits that if

23  Stonefire Grill had a product to sell, it could do so

24  on its website.  (Shemtov Depo. 123:16-20.)

25  Plaintiff states that the instant lawsuit is a

26  "first" step toward expansion into retail markets and

27  grocery stores in an effort to clear away FGF's

1  "invasive" marks which are already present in retail
2  establishments.  (Lopez Decl. ¶ 49.)

3      The other steps Plaintiff claims to have attempted
4  toward offering retail products include:

5      • looking at one potential commercial bakery
6        space in Santa Clarita, California sometime in
7        the last two years (SUF ¶ 111; SGI ¶ 111);

8      • attempting to engage its bread vendor to enter
9        into a partnership with Plaintiff to produce
10       bread (SUF ¶ 114; SGI ¶ 114);

11     • visiting a food show in Germany in 2011 to try
12       to find commercial ovens (SGI ¶¶ 42-43; Def.
13       SGI ¶¶ 42-43); and

14     • testing new barbeque sauce in one Stonefire
15       Grill location for a short time in late 2010
16       or early 2011 (SUF ¶ 118; SGI 118; Lopez
17       Decl., Exh. 17).

18 Plaintiff abandoned all of these attempts.  As a result
19 of these endeavors, Plaintiff did not lease any
20 commercial bakery space (SUF ¶ 113; SGI ¶ 113),
21 purchase a commercial oven (SUF ¶ 115; SGI ¶ 115), or
22 select a barbeque sauce (SUF ¶ 119; SGI ¶ 119; SGI ¶
23 39; Def. SGI ¶ 39).  Plaintiff has not conducted any
24 other tests for products that could potentially be sold
25 at retail.  (SUF ¶ 121; SGI ¶ 121.)  Plaintiff claims
26 that it plans to resume its efforts to manufacture and
27 sell BBQ sauce or dressing in its restaurants and in

1  retail stores after FGF's SAF products are removed from

2  retail stores.  (Lopez Decl. ¶ 50, Exh. 20.)

3      **5.  Marketing**

4      Plaintiff advertises its restaurants primarily via

5  local print publications, direct mail, radio, and

6  television news spots and on its website at

7  www.stonefiregrill.com.[16]  (SUF ¶¶ 65-68; SGI ¶¶ 65-68;

8  SGI ¶ 12; Def. SGI ¶ 12.)  Stonefire Grill restaurants

9  have also been featured in unsolicited media pieces in

10  chiefly Southern California publications.  (Lopez

11  Decl., Exh. 12.)  Plaintiff's marketing primarily

12  reaches individuals who live and work in the areas

13  surrounding its restaurants.  (SUF ¶ 203; SGI ¶ 203.)[17]

14  _____

15  [16] The only non-local examples of Plaintiff's
    marketing are a video segment from the CBS Evening News
16  featuring the value offered at Stonefire Grill
    restaurants (Lopez Depo. 40:21-41:15) and an appearance
17  by William Shatner on the Lopez Show where he mentioned
    Stonefire Grill was a supporter of one of his charity
18  events (Lopez 30(b)(6) Depo. 107:18-11):12).
    [17] Plaintiff attempts to dispute this fact by
19  pointing to the amount Stonefire Grill spent on
    marketing since 2005 and specific marketing and
20  promotional endeavors on social media, television,
    radio, print, email, and direct mail.  (Lopez Decl. ¶¶
21  18-26, Exhs. 7-12.)  However, no more than one or two
    of the hundreds of advertisements demonstrate any
22  potential reach beyond Southern California.
    Plaintiff's total advertising spending, social media
23  presence, and email blasts to unspecified recipients do
    not demonstrate that any of these marketing tools reach
24  non-Southern California consumers.  Conversely, the
    provided evidence, including print ads in Orange County
25  and San Fernando Valley publications and radio spots on
    local stations, supports the conclusion that Stonefire
26  Grill's marketing is focused on Southern California
    restaurant-goers.  Accordingly, the Court finds that
27  this fact is undisputed for purposes of summary
    judgment.

Case 2:11-cv-08292-JGB-PJW   Document 186   Filed 08/16/13   Page 39 of 74   Page ID #:7018

Since 2005, Plaintiff has expended a total of over $3,000,000 to market its services under the SG Marks. (Lopez Decl. ¶ 18.)

FGF's SAFs are marketed in California, across the United States, and in Canada. (Amjera Decl. ¶¶ 18, 21, 26.) FGF has engaged in public relations, marketing, and social media campaigns for its SAF products, including marketing in magazine articles, nationally-syndicated television shows, newspapers, retail market award lists, and multiple social media platforms. (SUF ¶¶ 21-26, 29; SGI ¶¶ 21-26, 29.) In spring 2012, FGF also conducted a marketing campaign using a SAF sampling truck which toured several cities around the country. (SUF ¶ 170; SGI ¶ 170.) In Los Angeles, the food truck event provided free samples to approximately 75,000 to 100,000 consumers. (SGI ¶ 102; Def. SGI ¶ 102.)

Stonefire Grill's and FGF's marks are not encountered side-by-side in the marketplace. (SUF ¶ 202; SGI ¶ 202.) Stonefire Grill considers its competitors to be grocery stores and restaurants that are proximately located to Stonefire Grill's locations. (SGI ¶ 35; Def. SGI ¶ 35.)[18]

---

[18] Defendant attempts to dispute this fact by pointing out that Plaintiff cannot name any specific grocery store location near its restaurants, nor has it engaged in any competitive shopping at grocery stores. (Def. SGI ¶ 35.) However, Defendant has not provided any evidence disputing Plaintiff's belief regarding its competitors. This fact remains undisputed.

39

### 6.   Other Uses of the Marks

Plaintiff is aware of several other unaffiliated restaurants around the country which use the word "Stonefire," including restaurants in Wisconsin, South Carolina, Illinois, and New Jersey.  (See SUF ¶¶ 123-24; SGI ¶¶ 123-24.)[19]  An internet search also reveals that there are numerous other restaurants which include the mark "Stonefire" in their name, such as Stonefire Restaurant and Kitchen in Barboursville, Virginia, Burwell's Stone Fire Grill in Charleston, South Carolina, and Stone Fire Bistro in Queens, New York.  (SUF ¶ 15; SGI ¶ 15.)

### 7.   Incidents of Confusion

Plaintiff documented seven (admissible) incidents, and FGF documented one incident where a person potentially confused Stonefire Grill as the source of SAF products.  The instances of alleged confusion include:

- A website contact form from "Ketty" on March 26, 2012 inquiring as to how she could enter the "hells kitchen trip to holliwood [sic]" at "www.stonefire.com" [sic].  ("Ketty Form," Lopez Decl., Exh. 13.)  FGF was featured on the television show "Hell's Kitchen" and featured a

---

[19] The restaurants in South Carolina and New Jersey also include the word "grill" in their name, specifically, Stonefire American Grill and Stonefire Grillehouse.  (SUF ¶ 124; SGI ¶ 124.)

40

Hollywood promotion; Plaintiff did not.  (SGI ¶ 54; Def. SGI ¶ 54.)

- A website contact form from "Jackie" on July 13, 2012 stating that she "bought 2 pkgs and you had an offer from Yaste [sic] of Home magazine on the wrapper.  I can not [sic] get the offer. Help."  ("Jackie Form," Lopez Decl., Exh. 14.)  Plaintiff does not sell any goods at retail and has not had an offer in Taste of Home magazine.  (SGI ¶ 56; Def. SGI ¶ 56.)

- In response to a tweet asking "Have any of you eaten @stonefiregrill ever?," on March 21, 2013, a twitter user identified as "@TexasFatAss" replied that "I saw some bread at the grocery that had that name.  Is that what your [sic] talking about?"  ("Tweet," Lopez Decl., Exh. 15.)

- Stonefire Grill employee, Elly Salter, reported that a friend from the East Coast was "quite taken back that" Stonefire Grill sold its products resale in supermarkets in the Tri-State area after visiting a grocery store in Norwalk, Connecticut.  ("Salter Story," Lopez Decl., Exh. 16.)

- Matthew Calabrese, Stonefire Grill's Vice President of Administration, testified that a friend named Matt Skubiszewski who lives in

41

1  Hermosa Beach, California stated that "I didn't
2  know you were selling bread in the
3  supermarket." (Deposition of Matthew Calabrese
4  ("Calabrese Depo.") 63:7-64:15, Buchner Decl.,
5  Exh. 5.)

6  • Mary Harrigan, co-owner of Stonefire Grill,
7  testified that after mentioning the instant
8  dispute, her cousin-in-law, Denise Moreno,
9  asked if she was "in the bread business"?
10  (Deposition of Mary Harrigan ("Harrigan Depo.")
11  112:17-115:19, Buchner Decl., Ex. 10.)

12  • Stonefire Grill's Operating Partner, Kaduri
13  Shemtov, stated that after visiting a
14  supermarket, his friend, Eli Alfi, asked "How
15  come I don't know that you are in the bread
16  business?" (Deposition of Kaduri Shemtov
17  ("Shemtov Depo.") 182:8-184:7, Buchner Decl.,
18  Exh. 6.)

19  • On December 1, 2012, a customer of Stonefire
20  Grill in Woodland Hills, California sent an
21  email to FGF customer service complaining about
22  his prior three visits to the restaurant.
23  ("FGF Inquiry," Amjera Decl., Exh. 6.) After
24  FGF asked whether the customer was mistaken,
25  the customer replied that he "was on the
26  stonefire grill site and tried to contact them
27  through 'contact us'." (Id.)

42

### 8.   Expert Testimony

The results of the likelihood of confusion study conducted by Dr. Gerald Ford evidenced that two respondents out of 310 survey takers demonstrated confusion between SAF and Stonefire Grill.  (Ford Decl. ¶ 8.)  Both of those respondents were located in Southern California; none of the respondents from the rest of California (98 surveys) or from the remainder of the United States (110 surveys) reported that they believed that SAFs are made by or with the approval of Stonefire Grill.  (Id.)  Statistically, the survey results indicate a 0.65 percent confusion rate in the United States and a 1.96 percent confusion rate in Southern California.  (Id. at 4 n.2.)  From this data, Dr. Ford opined that individuals are not likely to be confused into believing SAFs are being made or put out by, or are put out with the authorization or approval of, or have a business affiliation or connection with Stonefire Grill.  (Id. ¶ 9.)

Dr. Jacoby disputed the results of Dr. Ford's survey.  He took issue with the "Eveready" protocol used in the survey, which would only be appropriate if Stonefire Grill's mark were famous throughout the United States or strong among consumers of the services.  (Jacoby Report at 5.)  Since Stonefire Grill is neither famous, nor strong, the Eveready protocol would underestimate the level of confusion.  (Id.)

43

1  Jacoby also opposed surveying participants outside of
2  Southern California.  (<u>Id.</u> at 5-6.)  "Since the
3  overwhelming majority of plaintiff's clientele and
4  prospective clientele is probably confined to a 20 to
5  25 mile radius of its locations," testing participants
6  across the country reduced the survey's probative
7  value.  (<u>Id.</u> at 6.)  The remaining objections to Ford's
8  survey involved specific issues with the survey
9  questions, such as using the word "company" to refer to
10  Stonefire Grill, being too vague, and leading the
11  respondent.  (<u>Id.</u> at 6-8.)  Jacoby concludes that Dr.
12  Ford's study is scientifically unreliable to indicate
13  whether or not there is a likelihood of confusion.
14  (<u>Id.</u> at 10.)
15     Ms. Harper states several relevant opinions
16  including the conclusion that confusion is unlikely.
17  Harper opines that Plaintiff's mark is not strong
18  because it is narrowly confined to the geography of
19  Southern California and many other restaurants use a
20  similar name.  (Harper Decl. ¶¶ 11-12.)  Harper further
21  opines that confusion is unlikely because the two
22  brands are conveying different identities.  (<u>Id.</u> ¶ 13.)
23  Where FGF's logo conveys a "rustic, genuine, and
24  approachable" tenor, Plaintiff's logo conveys a "bold
25  and hot" attitude.  (<u>Id.</u> ¶ 15.)  Harper also believes
26  that Plaintiff's and Defendant's growth strategies are
27  unlikely to lead them to compete in the same products.

44

(<u>Id.</u> ¶ 18.)  Based on the numerous steps required to bring a product to market, Plaintiff would need to invest in expertise and technological resources beyond its current capabilities to compete in the retail marketplace.  (<u>Id.</u> ¶ 19.)  Harper also hypothesizes that Plaintiff's probability of retail success is extremely low and Plaintiff has done nothing to begin the process.  (<u>Id.</u> ¶¶ 21, 25.)  Harper summarizes that Plaintiff "lacks the preparation to enter the retail channel, as it has not taken any of the steps necessary, and lacks the practical ability to do so." (<u>Id.</u> ¶ 25.)

## IV.  DISCUSSION

**A.   Likelihood of Confusion**

In its First Amended Complaint, Plaintiff states five claims for relief for federal and state trademark infringement, false designation of origin under federal law, California unfair competition, and cancellation of the FGF Mark.  For each of its claims, Plaintiff must demonstrate that FGF is using a mark confusingly similar to Stonefire Grill's marks.  See <u>Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.</u>, 174 F.3d 1036, 1046 (9th Cir. 1999) ("[For a] trademark infringement claim under section 32 of the Lanham Act or an unfair competition claim under section 43(a) of the Lanham

1  Act, Brookfield must establish that West Coast is using

2  a mark confusingly similar to a valid, protectable

3  trademark."); Thane Int'l, Inc. v. Trek Bicycle Corp.,

4  305 F.3d 894, 901 n.3 (9th Cir. 2002) ("Trek must prove

5  a likelihood of confusion to succeed in its

6  infringement claim under California law . . . and its

7  unfair competition claim under California law."); FAC ¶

8  57 ("Plaintiff seeks to cancel Defendant's registration

9  of the mark on the grounds that such mark resembles

10 Plaintiff's "Stonefire Grill" Mark such as to be likely

11 to cause confusion . . . .").

12      The "likelihood of confusion" inquiry generally

13 considers whether a reasonably prudent consumer in the

14 marketplace is likely to be confused as to the origin

15 or source of the goods or services bearing one of the

16 marks or names at issue in the case.[20]  Rearden LLC v.

17 Rearden Commerce, Inc., 683 F.3d 1190, 1209 (9th Cir.

18 2012).  The Ninth Circuit employs eight factors

19 (Sleekcraft factors) to determine whether there is a

20 likelihood of confusion: 1) the strength of the mark;

21 _____

22 [20] Contrary to some of the parties' arguments, the
relevant inquiry is not whether a potential buyer would
23 mistakenly purchase Defendant's product or go to
Plaintiff's restaurant, believing it to be sponsored by
24 the opposing party, but whether the use by the party of
the name "Stonefire" on its flatbreads or restaurant is
25 "likely to cause confusion or mistake or to deceive
purchasers as to the source of origin of such goods or
26 services."  SunEarth, Inc. v. Sun Earth Solar Power
Co., Ltd., 846 F. Supp. 2d 1063, 1076 (N.D. Cal. 2012)
27 (citation and quotation omitted).

46

2) proximity or relatedness of the goods; 3) similarity
of the marks; 4) evidence of actual confusion; 5)
marketing channels used; 6) type of goods and the
degree of care likely to be exercised by the purchaser;
7) the defendant's intent in selecting the mark; and 8)
likelihood of expansion of the product lines.  See id.
(citing AMF Inc. v. Sleekcraft Boats, 599 F.2d 341,
348-49 (9th Cir. 1979)).  "This eight-factor analysis
is pliant, illustrative rather than exhaustive, and
best understood as simply providing helpful
guideposts."  Fortune Dynamic, 618 F.3d at 1030
(citation omitted).  The importance of each Sleekcraft
factor will vary in each particular case.  See
Brookfield Comm'ns, Inc. v. West Coast Entm't Corp.,
174 F.3d 1036, 1055 n.16 (9th Cir. 1999).

     "Because the likelihood of confusion is often a
fact-intensive inquiry, courts are generally reluctant
to decide this issue at the summary judgment stage."
Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc., 457
F.3d 1062, 1075 (9th Cir. 2006); see also Fortune
Dynamic, Inc., 618 F.3d at 1031.  However, "in cases
where the evidence is clear and tilts heavily in favor"
of one party, the Ninth Circuit has "not hesitated to
affirm summary judgment on this point."  Au-Tomotive
Gold, Inc., 457 F.3d at 1075; see, e.g., Surfvivor
Media, Inc. v. Survivor Prods., 406 F.3d 625, 635 (9th
Cir. 2005).  "To prevail on the ultimate question . . .

47

—the likelihood of confusion of consumers—[the plaintiff] must show sufficient evidence to permit a rational trier of fact to find that confusion is 'probable,' not 'merely possible.'" M2 Software, Inc. v. Madacy Entertainment, 421 F.3d 1073, 1085 (9th Cir. 2005) (citation omitted).

Applying the Sleekcraft factors to the undisputed facts, the Court finds that Plaintiff has not demonstrated that likelihood of confusion over the source of FGF's SAFs or of Stonefire Grill's restaurants is probable.

## 1. Strength of the Marks

"The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." Brookfield, 174 F.3d at 1058. The Ninth Circuit utilizes a two-prong test to determine the strength of a particular mark. Both the conceptual strength and the commercial strength of a mark are considered. See GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1207 (9th Cir. 2000).

In its FAC, Plaintiff relies on a forward confusion claim, which occurs if consumers believe that goods bearing the FGF Mark came from, or were sponsored by, Stonefire Grill. See Surfvivor Media, 406 F.3d at 630. "To avoid summary judgment on a forward confusion claim, [Plaintiff] must raise a material question of

1   fact regarding whether the buying public thought that

2   [Stonefire Grill] was either the source of, or was

3   sponsoring, [FGF's Stonefire Authentic Flatbreads]."

4   Id.  In its opposition, Plaintiff argues that summary

5   judgment is improper under either a forward or reverse

6   confusion analysis.  (Opp'n at 11.)  Reverse confusion

7   "occurs when [FGF] saturates the market with a similar

8   trademark and overwhelms [Stonefire Grill]."  JL

9   Beverage Co., LLC v. Beam, Inc., 899 F. Supp. 2d 991,

10  998 (D. Nev. 2012).  The Court need not determine

11  whether Plaintiff raised a material issue of fact on

12  the reverse confusion claim because it failed to raise

13  it in its complaint.  See Surfvivor Media, 406 F.3d at

14  631 (refusing to consider plaintiff's forward confusion

15  claim because his complaint contained no facts to

16  support that claim).  Nevertheless, the Court proceeds

17  to analyze both claims and finds that Plaintiff's

18  evidence fails to support a claim for confusion in

19  either direction.

20          **a.   Strength of the SG Marks**

21      "A mark's conceptual strength depends largely on

22  the obviousness of its connection to the good or

23  service to which it refers."  Network Automation, 638

24  F.3d at 1149.  Conceptual strength falls on a continuum

25  of marks from "'generic,' afforded no protection;

26  through 'descriptive' or 'suggestive,' given moderate

27  protection; to 'arbitrary' or 'fanciful' awarded

1  maximum protection." One Indus., LLC v. Jim O'Neal
2  Distrib., Inc., 578 F.3d 1154, 1164 (9th Cir. 2009)
3  (quotation omitted).  The Court finds that Plaintiff's
4  mark is suggestive because it "conveys an impression of
5  a good but requires the exercise of some imagination
6  and perception to reach a conclusion as to the
7  product's nature." Id. at 1164 (quotation omitted).
8  Contrary to Plaintiff's claim that its mark is
9  "arbitrary" because it has no intrinsic connection to
10  its services, it takes only a small exercise of
11  imagination to associate the name "Stonefire Grill"
12  with a restaurant serving mainly grilled and barbequed
13  items.  See Brookfield, 174 F.3d at 1058 (holding
14  "MovieBuff" to be suggestive in the context of computer
15  software for researching movies); SunEarth, 846 F.
16  Supp. 2d at 1078 (finding that plaintiff's "SunEarth"
17  mark was suggestive when used in connection with solar
18  collector panels).
19      "Although a suggestive or descriptive mark . . . is
20  inherently a weak mark, it may be strengthened by such
21  [commercial] factors as extensive advertising, length
22  of exclusive use, public recognition . . . ."
23  Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1144
24  (9th Cir. 2002); see also Brookfield Commc'n, 174 F.3d
25  at 1058 (9th Cir. 1999) ("[S]uggestive marks are
26  presumptively weak.").  "The commercial strength of the
27  [SG Mark] is relevant for the Court's forward confusion

50

analysis only." JL Beverage, 899 F. Supp. 2d at 1001. For forward confusion, the Court examines the commercial strength of the mark among the junior user's, i.e., FGF's potential purchasers.  See M2 Software, 421 F.3d at 1080.

"Commercial strength is based on actual marketplace recognition, and thus advertising expenditures" are often a sound measure of commercial success.  Network Automation, 638 F.3d at 1149 (quotation marks and citation omitted).  Plaintiff has spent a decent sum to engage in multifaceted advertising of its restaurants within the Southern California area over the last eight years.  Nevertheless, the Court finds that it has a relatively weak presence in the relevant market.  Since FGF sells its SAFs to consumers nationwide and engages in national advertising, the relevant geographic market is coast-to-coast.  See Tana v. Dantanna's, 611 F.3d 767, 776 (11th Cir. 2010); Brennan's, Inc. v. Brennan's Rest., L.L.C., 360 F.3d 125, 132 (2d Cir. 2004). Plaintiff is a small restaurant chain with its primary advertising presence in Southern California and thus its national commercial strength is weak.  See JL Beverage, 899 F. Supp. 2d at 1001 ("JL Beverage has a relatively weak presence in the marketplace.  It engages in local rather than national advertising and has a small advertising budget . . . . [and] is still a small, growing corporation with a minimal presence on

51

alcohol and grocery store shelves."). Plaintiff's advertising expenditures therefore do not affect the strength of the SG Marks in the relevant market.

"When similar marks permeate the marketplace, the strength of the mark decreases." One Indus., 578 F.3d at 1164. Defendant produces evidence to show that numerous restaurants across the country use the word "Stonefire" in their name, and a subset of those include both "stonefire" and "grill." Although these restaurants are located throughout the relevant marketplace, none of the other marks are particularly strong as they represent only a handful of individually owned restaurants, mostly in small cities. The Court cannot find that this situation presents a "crowded field," indicating "extensive third party use of similar marks on similar goods." Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha, 290 F.Supp.2d 1083, 1091 (C.D. Cal. 2003); see Rearden, 683 F.3d at 1211 ("[Although] over 840 other companies use the word "Rearden," or some variation thereof, in their respective names[, o]nly four of these entities identify themselves as technology or engineering firms, and each of these four companies has headquarters outside of California, lacks an Internet presence, and employs fewer than five people."). This does not modify the strength of the SG Marks.

1    Because the SG Marks are suggestive and not well

2    recognized in the relevant marketplace, the Court

3    determines that the marks' overall strength is weak for

4    the purposes of Plaintiff's forward confusion claim.

5              **b.   Strength of the FGF Mark**

6         "In reverse confusion cases, courts evaluate the

7    conceptual strength of the senior user's (Stonefire

8    Grill) mark and compare it to the commercial strength

9    of the junior user's (FGF) mark." <u>Moose Creek, Inc. v.</u>

10   <u>Abercrombie & Fitch Co.</u>, 331 F.Supp.2d 1214, 1224 (C.D.

11   Cal. 2004).  The key question is whether consumers who

12   encounter the senior user's products will believe that

13   they are associated with the junior user.  <u>See</u> <u>Walter</u>

14   <u>v. Mattel, Inc.</u>, 210 F.3d 1108, 1110 (9th Cir. 2000).

15   As discussed above, the SG Marks are weak.  By

16   comparison, the FGF Mark is relatively commercially

17   strong but geographically diffuse.  FGF presents

18   undisputed evidence that SAFs are nationally promoted

19   spanning a wide array of mediums, including placement

20   on cable television shows, widely distributed

21   magazines, and daily newspapers.  (Ostroff Decl., Exh.

22   3.)  SAFs are available in over 20,000 markets

23   throughout the United States.

24        Because the SG Marks are relatively weak and the

25   commercial strength of the FGF Mark is strong, the

26   Court determines that this factor favors Defendant for

27   the purpose of reverse confusion analysis.  Unlike in

forward confusion, in reverse confusion analysis, the relevant market is the senior mark's geographic vicinity.  See Walter v. Mattel, Inc., 31 F. Supp. 2d 751, 758 (C.D. Cal. 1998) aff'd, 210 F.3d 1108 (9th Cir. 2000).  To the extent their products compete, Defendant's commercial strength is not likely to overwhelm Plaintiff in Southern California where Plaintiff has a strong presence and has engaged in substantial marketing of its restaurants.  Cf. Cohn v. Petsmart, Inc., 281 F.3d 837, 842 (9th Cir. 2002) (finding that a defendant's extensive national advertising overtook plaintiff's, a local veterinarian, where he "promoted the mark only through local yellow page listings, handbills, occasional advertisements in the local newspaper, and an advertisement in a high school volleyball calendar").  Even if the Court were to conclude that Defendant's commercial strength and advertising expenditures are likely to overwhelm Plaintiff's marks in the relevant market, this fact is offset by the relative weakness of Plaintiff's mark, which is suggestive only, and commonly used in restaurant names.  Since Defendant's commercial strength is not likely to overwhelm Plaintiff's restaurants in Southern California and Plaintiff's mark is conceptually weak, the Court cannot believe that a reasonable consumer eating at a Stonefire Grill restaurant would believe that the restaurant is

1  sponsored by or affiliated with Defendant.  <u>See</u> <u>Glow</u>
2  <u>Indus., Inc. v. Lopez</u>, 252 F. Supp. 2d 962, 992 (C.D.
3  Cal. 2002).

4      Overall, the strength of the mark factor under
5  either a reverse or forward confusion analysis favors
6  Defendant.

7      **2.   Proximity or Relatedness of the Goods and**
8          **Services**

9      Related goods (or services) are those "which would
10 be reasonably thought by the buying public to come from
11 the same source if sold under the same mark."  <u>Rearden</u>,
12 683 F.3d at 1212 (citation omitted).  The proximity of
13 goods is measured by whether the products are: (1)
14 complementary; (2) sold to the same class of
15 purchasers; and (3) similar in use and function.
16 <u>Network Automation</u>, 638 F.3d at 1150.

17     Here, both parties do not even sell goods.
18 Plaintiff provides restaurant services to its
19 customers, while Defendant sells a food product at
20 retail.  "[T]o establish likelihood of confusion a
21 party must show *something more* than that similar or
22 even identical marks are used for food products and for
23 restaurant services."  <u>In re Coors Brewing Co.</u>, 343
24 F.3d 1340, 1345 (Fed. Cir. 2003) (quotation omitted).
25 Plaintiff has not shown anything more.

26     Plaintiff argues that the Court should find the
27 goods are the same because they both involve food.

55

(Opp'n at 14.)  Plaintiff continues that Plaintiff's
service and Defendant's products are sold to the same
class of consumers because they cater to "people who
are hungry or expect to be hungry."  (Id.)  Plaintiff's
definition is preposterous.  Under this line of
reasoning, every single human being is within the
relevant class of purchasers since food is a necessity
of life.  The Court refuses to define the category of
products so broadly.

     "[C]ourts have held that the mere fact that two
products or services fall within the same general field
. . . does not mean that the two products or services
are sufficiently similar to create a likelihood of
confusion."  Matrix Motor, 290 F.Supp.2d at 1092
(quotation omitted).  Although both companies offer
food, Stonefire Grill focuses on meals, primarily
meats, salads, and sandwiches, while FGF sells only one
ingredient – flatbread.  Stonefire Grill does not offer
any naan, roti, or pita on its menu.

     Moreover, Stonefire Grill does not sell any
products to its customers, let alone bread products.
FGF's flatbreads are prepackaged grocery items, while
all of Stonefire Grill's food is prepared for
consumption in the restaurant or for take-out.
Stonefire Grill's function is to provide a full dining
experience, whereas SAFs are to be used as an
"ingredient" from which a consumer can "create a meal

from scratch."[21]   Multiple courts have found that
similar products were not related for purposes of
trademark confusion.  See, e.g., Icebreaker Ltd. v.
Gilmar S.P.A., 911 F. Supp. 2d 1099, 1105 (D. Or. 2012)
(finding clothing companies unrelated where plaintiff
sold active wear and defendant sold designer apparel);
Nautilus Grp., Inc. v. Savvier, Inc., 427 F. Supp. 2d
990, 997 (W.D. Wash. 2006) (holding two pieces of
exercise equipment unrelated where they were "marketed
to different classes of consumers who aim to
exercise"); Echo Drain v. Newsted, 307 F. Supp. 2d
1116, 1125 (C.D. Cal. 2003) ("Although Echo Drain and
Echobrain are both music bands, it is undisputed that
they play different types of music:" pop rock and
progressive funk and groove with elements of heavy
metal).  Based on the undisputed facts, the Court finds
that Plaintiff's services and Defendant's goods are
unrelated.

     In order to support its claim of relatedness,
Plaintiff cites to Dreamwerks Prod. Grp., Inc. v. SKG
Studio, 142 F.3d 1127 (9th Cir. 1998), where the Ninth
Circuit found that a well-known movie studio and a
sponsor of science fiction conventions were related
because "it's easy for customers to suspect DreamWorks
of sponsoring conventions at which movie merchandise is
sold."  Id. at 1131.  This case is distinguishable in

---

[21] www.stonefire.com/our-story/

1  many respects.  First, unlike in <u>Dreamwerks</u>, the main
2  products sold at Stonefire Grill restaurants are not
3  flatbreads.  If Plaintiff owned a chain of Indian or
4  even Mediterranean restaurants, Plaintiff's argument
5  might be persuasive, but Stonefire Grill does not
6  specialize in or even sell flatbreads.  Second, the
7  <u>Dreamwerks</u> court focused on the fact that
8  "entertainment studios control all sorts of related
9  industries" and frequently merchandise products based
10 on the movies they make.  <u>Id.</u>  Like entertainment
11 studios, restaurants may expand into grocery products
12 based on the food offered at their restaurants.
13 However, restaurant customers are not likely to assume
14 that a restaurant sponsors food products that the
15 restaurant does not offer, make, or sell at its
16 locations.  Whereas Dreamworks Studio makes science
17 fiction movies and therefore is likely to merchandise
18 products based on those movies, Stonefire Grill does
19 not make or sell flatbreads and therefore it is not
20 reasonable to assume that Stonefire Grill customers
21 will associate the restaurants with the flatbreads or
22 visa versa.  <u>See</u> <u>In re Coors</u>, 343 F.3d at 1346 (finding
23 that "Blue Moon" for use with restaurant services was
24 not related to "Blue Moon" beer, even though some
25 restaurants brew or sell their own beer, because the
26 mark was not used in connection with a brewpub).  Thus,
27

1  <u>Dreamwerks</u> does not support Plaintiff's claim of
2  relatedness.

3     **3.   Similarity of the Marks**

4     The similarity of the marks is a critical question
5  in this analysis.  <u>GoTo.Com</u>, 202 F.3d at 1205.  "[T]he
6  greater the similarity between the two marks at issue,
7  the greater the likelihood of confusion."  <u>Id.</u> at 1206.

8     Three general principles help determine whether
9  marks are similar.  First, "[s]imilarity is best
10 adjudged by appearance, sound, and meaning."
11 <u>Entrepreneur</u>, 279 F.3d at 1144.  Second, the "marks
12 must be considered in their entirety and as they appear
13 in the marketplace."  <u>GoTo.com</u>, 202 F.3d at 1206.
14 Third, "similarities are weighed more heavily than
15 differences."  <u>Fortune Dynamic</u>, 618 F.3d at 1032.

16     **a.   Additional Words Convey Meaning**

17     Despite the presence of a common word, the Court
18 finds that the marks, when viewed in their entirety and
19 as they appear in the marketplace, are dissimilar.  In
20 "considering the degree of similarity between the two
21 marks, courts should analyze each mark within the
22 context of other identifying features."  <u>Surfvivor</u>, 406
23 F.3d at 633.  Crucially, Plaintiff's marks include the
24 word "Grill," whereas Defendant's mark includes the
25 words "Authentic Flatbreads."[22]  Plaintiff points out

26  ――――――――――
[22] Although the FGF Mark is solely for the word
27 "stonefire," there is no evidence in the record that
   Defendant uses just the word "stonefire" to describe
        (continued . . .)

59

1    that it occasionally uses just the word "Stonefire" to

2    reference its products.  However, in these few

3    instances, the word is used as a descriptive adjective

4    to connote an item or service the restaurants offer,

5    i.e. "Stonefire's BBQ Beef."  These uses of the mark

6    are secondary and only visible in places where the

7    entirety of Plaintiff's logo is also present, for

8    example, on its menu or website.  A reasonable consumer

9    viewing Plaintiff's restaurants in the marketplace

10   would recognize their mark as "Stonefire Grill," not

11   simply "Stonefire."  See Estate of P.D. Beckwith, Inc.,

12   v. Comm'r of Patents, 252 U.S. 538, 545-46 (1920)

13   ("[C]ommercial impression of a trade-mark is derived

14   from it as a whole, not from its elements separated and

15   considered in detail.").  Notably, all of Plaintiff's

16   trademark registrations include both the words

17   "Stonefire" and "Grill."

18       The additional words in the marks are crucial here

19   because they describe or at least suggest the products

20   or services offered by the party.  Defendant only sells

21   flatbreads, therefore, the inclusion of the words

22   "authentic flatbreads" in its mark serves to

23   distinguish it from other uses of the word "stonefire."

24

25       ( . . . continued)
     its products.  The Court therefore considers, as it
26   must, the entirety of Defendant's mark as it appears in
     the marketplace, specifically as "Stonefire Authentic
27   Flatbreads."

60

1  Similarly, just as with other restaurants such as

2  "Chipotle Mexican Grill," "Veggie Grill," and "Daily

3  Grill," the inclusion of the word "grill" in the SG

4  Marks indicates that Plaintiff is a restaurant.

5       Multiple courts have found that the presence of a

6  common word does not render two marks similar where

7  additional words make the marks distinctive.  The Ninth

8  Circuit's decision in Alpha Indus., Inc. v. Alpha Steel

9  Tube & Shapes, Inc., 616 F.2d 440 (9th Cir. 1980)

10  compels the Court's outcome here.  Just as with FGF, in

11  Alpha, appellant used the name Alpha Industries, Inc.,

12  and had a trademark for the word "Alpha."  Id. at 444.

13  Appellee, like Stonefire Grill here, used the tradename

14  Alpha Steel Tube & Shapes, Inc. and had a trademark for

15  "Alpha Steel."  Id.  The Ninth Circuit refused to look

16  just at the word "Alpha" alone, and instead, after

17  considering the marks and names in their entirety found

18  that the "other words are significant words, indicating

19  a different origin."  Id.  Just as in Alpha, the

20  presence of the other words beside "stonefire"

21  indicates that the marks are not similar.  See also

22  Official Airline Guides, Inc. v. Goss, 6 F.3d 1385,

23  1392 (9th Cir. 1993) (finding "The Travel Planner USA"

24  and "USA Travel Planner" are substantially different

25  than OAG's mark, "OAG Travel Planner"); Icebreaker, 911

26  F. Supp. 2d at 1105 (no similarity between "Iceberg"

27  and "Icebreaker" apparel); Stark v. Diageo Chateau &

Estate Wines Co., 907 F. Supp. 2d 1042, 1054 (N.D. Cal. 2012) ("Even if the dominant portion of the wines' names is 'stark,' this does not mean that the other words in the name have no significance.").

## b.   Appearance

In addition to the fact that the marks convey different meanings, the appearance of the marks is also distinct.  Stonefire Grill's red, fiery, capital lettering is not similar to FGF's white scripted upper- and lower-cased letters.  The presence of the words "grill" and "authentic flatbreads" not only convey meaning but also make the logos visually unique. Moreover, FGF's logo includes a graphic of orange fire within a circle above the text.  No design or graphic accompanies Plaintiff's mark.  See Surfvivor, 406 F.3d at 633 ("In considering the degree of similarity between the two marks, courts should analyze each mark within the context of other identifying features."). The Court concludes that other than the inclusion of the word "stonefire" the marks are not visually alike.

The features of the marks are only an initial consideration; the court must also "consider[] the overall impression created by the mark as a whole." Stark v. Diageo Chateau & Estate Wines Co., 907 F. Supp. 2d 1042, 1054 (N.D. Cal. 2012) (citation and quotation omitted).  Uncontroverted expert testimony indicates that the marks convey different identities.

(Harper Decl. ¶ 13.)  SAFs logo communicates a "rustic" or artisan identity, while Stonefire Grill conveys a "bold and hot" attitude.  (Id. ¶ 15.)  The Court finds that the differences in brand identities conveyed by the marks supports the conclusion that consumers are unlikely to be confused.  See Stark, 907 F. Supp. 2d at 1056 (finding that "Stark Wine's" label conveyed a "sophisticated, traditional" style, while the "Stark Raving" mark suggested "it is more radical in approach").

        c.   Sound

     Given that both marks use the word "stonefire" at the beginning of their name, the sound of the marks is similar.  This factor, however, is granted less weight where the products and services are distinct and used differently in speech.  For example, if a potential consumer said "Let's go to Stonefire for lunch," it is likely to cause confusion with SAF since FGF does not operate any restaurant locations.  Moreover, consumers confront SAF in grocery stores where the sight of the logo, not its sound, is key.  See JL Beverage, 899 F. Supp. 2d at 1002 ("[S]ight is the most important sub-factor, because the parties discuss consumer confusion primarily in the context of buyers interested in purchasing a bottle of their respective vodkas at a liquor or grocery store.").

1    Nevertheless, the Court finds that this subfactor
2  weighs in favor of confusion.  Cf. Nautilus Group, Inc.
3  v. Savvier, Inc., 427 F.Supp.2d 990, 996
4  (W.D.Wash.2006). ("The common sound of flex is not
5  sufficient ground for this Court to conclude that
6  Bowflex and Bodyflex sound alike.").
7    In sum, the Court finds that the lack of similarity
8  between the marks, both in their appearance and
9  meaning, indicates that consumers are not likely to be
10 confused.
11    **4.  Evidence of Actual Confusion**
12    "[E]vidence of actual confusion, at least on the
13 part of an *appreciable portion* of the actual consuming
14 public, constitutes strong support for a 'likelihood of
15 confusion' finding." Rearden, 683 F.3d at 1210
16 (emphasis added); see also Japan Telecom, Inc. v. Japan
17 Telecom Am. Inc., 287 F.3d 866, 874 (9th Cir. 2002)
18 (holding that party must put forth "persuasive evidence
19 that a significant number of consumers have formed a
20 similar mental association" to demonstrate actual
21 confusion).  However, the absence of evidence of actual
22 confusion is generally unnoteworthy because actual
23 confusion is hard to prove. Brookfield, 174 F.3d at
24 1050.
25    The eight examples of potential consumer confusion
26 in the record do not support a finding that any
27 appreciable number of consumers is confused by the two

64

marks.[23]  Given that the two marks have existed in the market together for over two years and SAF is available in 22,000 stores, a handful of examples of anecdotal confusion are insufficient to support a finding confusion.  See Surfvivor, 406 F.3d at 633 (finding "scant evidence of actual confusion in the record" where Plaintiff provided only two examples and a Defendant's survey showed an absence of confusion); Cohn, 281 F.3d at 843 n.7 (upholding summary judgment and finding that "several dozen inquires over the years about whether the parties were related" "are too ambiguous to demonstrate actual confusion"); Nautilus, 427 F. Supp. 2d at 998 ("However difficult it may be to prove confusion over the three years that the two marks sold resistance exercise products . . . , one phone

---

[23] Several of the examples Plaintiff provided do not provide evidence that the individual is confused as to the source of the product, as opposed to merely "consumer error not related to name confusion."  Icon Enterprises Int'l, Inc. v. Am. Products Co., CV 04-1240 SVW PLAX, 2004 WL 5644805 (C.D. Cal. Oct. 7, 2004).  For example, both the Ketty Form and the FGF Inquiry demonstrate that the sender merely contacted the wrong company, as opposed to any source confusion.  (See Ketty Form; FGF Inquiry.)  The remaining emails and social media contacts are equally ambiguous.  See Mattel, Inc. v. MCA Records, Inc., 28 F. Supp. 2d 1120, 1149 (C.D. Cal. 1998) aff'd, 296 F.3d 894 (9th Cir. 2002) ("Although some of these e-mails inquire about obtaining the song, others simply repeat lyrics of the song, state that they 'love' the song, or even explicitly recognize that the song was not approved by Mattel. . . . These responses are ambiguous, at best, as to whether the writers believe Mattel is responsible for the song.").  Thus, these examples are not evidence of actual consumer confusion, and only four examples of confusion supplied by friends and family members of Stonefire Grill employee's remain.

1  call is simply not enough to demonstrate a likelihood

2  of confusion."); Mattel, Inc. v. MCA Records, Inc., 28

3  F. Supp. 2d 1120, 1149 (C.D. Cal. 1998) aff'd, 296 F.3d

4  894 (9th Cir. 2002) ("De minimis evidence of actual

5  confusion does not establish the existence of a genuine

6  issue of material fact regarding likelihood of

7  confusion . . . ."). Moreover, Stonefire Grill

8  employees reported the few examples of actual confusion

9  experienced by their family and friends. Numerous

10 courts have disregarded similar examples. See Walter

11 v. Mattel, Inc., 210 F.3d 1108, 1111 (9th Cir. 2000).

12     Defendant makes much of the fact that it provided

13 survey evidence to support the conclusion that there is

14 very little actual confusion between Stonefire Grill

15 and SAF. (Motion at 17-18.) The Ford survey

16 demonstrates at most a 2 percent rate of confusion in

17 Southern California and a .65 percent rate in the

18 nation. However, Plaintiff's expert Dr. Jacoby

19 disputed the method, technique, and results of the Ford

20 survey. In light of Jacoby's objections to the survey

21 and the manner in which it was conducted, the Court

22 finds that the survey results are in dispute and will

23 not consider the survey here.

24     Nevertheless, the Court does note that Plaintiff

25 failed to provide a consumer survey showing a

26 likelihood of confusion; failure to do so "warrants a

27 presumption that the results would have been

unfavorable." <u>Playboy Enterprises, Inc. v. Netscape Communications Corp.</u>, 55 F.Supp.2d 1070, 1084 (C.D.Cal.1999), <u>aff'd,</u> 202 F.3d 278 (9th Cir. 1999). However, construing the facts in the light most favorable to Plaintiff, the Court does not draw such an inference, and instead finds that this factor is neutral in the confusion analysis.

### 5. Marketing Channels Used

This factor considers how and to whom the respective parties' goods are sold. <u>Stark</u>, 907 F. Supp. 2d at 1057. "Convergent marketing channels increase the likelihood of confusion." <u>M2 Software</u>, 421 F.3d at 1083. The Court considers the locations of potential buyers, the price ranges of the goods or services, and the types of advertising used. <u>See Sleekcraft</u>, 599 F.2d at 353.

Here, Plaintiff's potential consumers are restaurant goers located in Southern California, while Defendant's customers are food distributors, supermarkets, club stores, and grocery patrons across the country. Defendant's goods sell for less than $3.00 whereas a meal at Stonefire Grill costs over $10.00. As discussed above, Defendant's good are promoted nationally, whereas Plaintiff's advertising is primarily limited to local media outlets.

Plaintiff argues that the marketing channels are the same because Stonefire Grill and FGF are

competitors. See Sleekcraft, 599 F.2d at 348. ("If
goods directly compete, then confusion will usually
arise . . . ."). Plaintiff cites to the fact that (1)
Stonefire Grill considers its competitors to be any
establishment that offers food, (2) grocery stores
offer the same dining experience as restaurants, and
(3) Defendant used a food truck which is a mobile
restaurant. (Opp'n at 16-17.)

First, while Plaintiff may subjectively believe
that it competes with grocery stores, it has not
produced any evidence to demonstrate that it does. The
Court declines to hold that all food-related companies
are competitors for the purpose of trademark confusion.
Second, the fact that grocery stores sell prepared food
does not mean that the marketing channels between them
and restaurants are the same, or that the two compete
for the same consumers. Even if the Court found that
grocery stores' prepared foods compete with "fast
casual" restaurants, it would be irrelevant here where
Defendant's product is not a prepared food item, nor is
it consumed within a grocery store. Third, Defendant's
use of a sampling truck for a tour of five cities where
it offered free flatbread samples does not permit any
reasonable inference that Defendant is operating a
restaurant that competes with Plaintiff's full-service
establishments. Plaintiff's arguments that Stonefire
Grill and FGF compete are not supported by the facts

1  and stretch the standard regarding similar marketing
2  channels beyond its outer limits.

3      It is undisputed that Plaintiff's and Defendant's
4  products are not encountered together in the
5  marketplace and do not rely on the same methods of
6  marketing, distribution, or sale.  Accordingly, this
7  factor weighs in favor of no confusion.

8      **6.   Degree of Consumer Care**

9      This _Sleekcraft_ factor relates to "the relative
10 sophistication of the relevant consumer, and the degree
11 of care likely to be exercised by that consumer."
12 _Fortune Dynamic,_ 618 F.3d at 1038.  "Low consumer care
13 . . . increases the likelihood of confusion." _Network_
14 _Automation,_ 638 F.3d at 1152 (quotation omitted).

15     Both Defendant's and Plaintiff's products are low
16 in cost and cater to all consumers.  Therefore, this
17 factor is inconsequential to the analysis.

18     **7.   Intent in Selecting the Mark**

19     "While an intent to confuse consumers is not
20 required for a finding of trademark infringement,
21 intent to deceive is strong evidence of a likelihood of
22 confusion.  When the alleged infringer knowingly adopts
23 a mark similar to another's, reviewing courts presume
24 that the defendant can accomplish his purpose: that is,
25 that the public will be deceived." _One Industries_, 578
26 F.3d at 1163 (citation and quotation omitted).

27

69

1    Plaintiff argues that FGF was aware of Stonefire

2    Grill's trademark at the time it conducted its

3    Trademark Search Report and selected its brand name in

4    2010.  (Opp'n at 18.)  Since FGF selected and continued

5    to use the Stonefire name after it was aware of

6    Plaintiff's rights, Plaintiff argues it did so with

7    intent.  The Court recognizes, however, that Defendant

8    was also aware that Plaintiff's marks are only

9    registered in a class for restaurants and bars, and

10   Defendant did not intend to operate in those fields.

11   Moreover, merely conducting a trademark search and

12   discovering Plaintiff's use is insufficient to

13   demonstrate intent.  In M2 Software, just as here, the

14   defendant conducted a trademark search which uncovered

15   Plaintiff's mark prior to defendant's product launch

16   launch.  421 F.3d at 1085.  The defendant's attorney,

17   just like FGF's lawyer, counseled that its proposed

18   mark would not infringe.  Id.  Given this evidence and

19   the fact that the defendant was a much larger company

20   than the plaintiff, the Ninth Circuit found that this

21   factor weighed in the defendant's favor.  Id.  This

22   Court agrees that there is no evidence that FGF

23   intended to deceive consumers by adopting the word

24   "stonefire" as part of its brand name.  This factor

25   weighs in Defendant's favor.

26

27

70

1    **8.   Likelihood of Expansion**

2         The issue here is whether existence of the

3    allegedly infringing mark is hindering the plaintiff's

4    expansion plans.  See Entrepreneur Media, 279 F.3d at

5    1152.  Plaintiff must demonstrate "'a *strong*

6    possibility of expansion into competing markets' for

7    this factor to 'weigh[ ] in favor of a finding of

8    infringement.'"  M2 Software, 421 F.3d at 1085 (citing

9    E. & J. Gallo, 967 F.2d at 1293).

10        Construing the facts in the light most favorable to

11   Plaintiff, Stonefire Grill tried to take steps to

12   expand into selling retail products in grocery stores,

13   but it abandoned its efforts sometime in 2011.

14   Plaintiff claims, providing no supporting facts, that

15   its efforts to expand into retail were hindered by the

16   presence of FGF's existing products.  See Surfvivor,

17   406 F.3d at 634 ("Although Deptula expressed interest

18   in expanding his product line, mere speculation is not

19   evidence.").  Plaintiff's "complete inability to adduce

20   any concrete evidence of expansion plans" tilts this

21   factor in favor of Defendant.  Id.

22        Moreover, the undisputed evidence demonstrates that

23   there is not a "strong possibility" that Plaintiff

24   would be ready or able to expand into retail in the

25   near future.  Plaintiff has not engaged in any of the

26   steps necessary to develop a product and enter it into

27   the retail market, nor does it have the experience or

1   expertise to do so.  (Harper Decl. ¶ 25.)  Plaintiff

2   argues that many other restaurants, such as California

3   Pizza Kitchen, TGIF, PF Changs, and Wolfgang Puck have

4   made the jump from restaurants into retail

5   distribution.  (Opp'n at 18.)  The Court acknowledges

6   that it is possible for a restaurant to expand into

7   retail.  Here, however, the question is whether

8   Stonefire Grill has demonstrated a strong possibility

9   of making that jump.  The Court finds that Plaintiff

10  has failed to adduce any evidence of steps it has taken

11  or plans it has made that concretely demonstrate it is

12  capable of creating, developing, and distributing a

13  food product in retail food stores.

14      Based on the facts presented, the Court finds that

15  this factor favors no likelihood of confusion.

16  **B.   Overall Analysis of _Sleekcraft_ Factors**

17      The Court finds that Plaintiff's central argument

18  is unpersuasive.  The fact that restaurants can expand

19  to sell grocery items does not compel a finding of

20  confusion here.  The Federal Circuit aptly summarized

21  why Plaintiff's argument is unavailing:

22          "[S]ome restaurants sell their own private
            label ice cream, while others sell their own
23          private label coffee.  But that does not mean
            that any time a brand of ice cream or coffee
24          has a trademark that is similar to the
            registered trademark of some restaurant,
25          consumers are likely to assume that the coffee
            or ice cream is associated with that
26          restaurant. . . . [I]n light of the very large
            number of restaurants in this country and the
27          great variety in the names associated with
            those restaurants, the potential consequences

72

of adopting such a principle would be to limit dramatically the number of marks that could be used by producers of foods and beverages." In re Coors Brewing Co., 343 F.3d 1340, 1346 (Fed. Cir. 2003). Accordingly, the Federal Circuit held that in order "to establish likelihood of confusion a party must show *something more* than that similar or even identical marks are used for food products and for restaurant services." Id. at 1345 (quotation omitted). Here, Plaintiff has failed to demonstrate anything more than that similar marks are used for a food product, namely flatbreads, and Plaintiff's Stonefire Grill restaurants. Therefore, summary judgment is appropriate.

Based on the eight Sleekcraft factors, the Court finds that an appreciable number of reasonably prudent consumers in the marketplace are not likely to be confused as to the origin or source of the goods or services bearing the SG Marks or FGF Mark. Rearden, 683 F.3d at 1209; Entrepreneur Media, 279 F.3d at 1151. Of the eight factors, six favor the conclusion of no confusion, and two are neutral in the analysis. The Court finds that the strongest factors favoring summary judgment are the lack of similarity of the marks, the distinctive marketing channels, and the weakness of Plaintiff's mark. Given the fact that the parties do not seriously dispute most of the evidence, the undisputed facts are clear and tilt heavily in favor of Defendant. Plaintiff has failed to provide "sufficient

evidence to permit a rational trier of fact to find that confusion is 'probable,' not 'merely possible.'" _M2 Software_, 421 F.3d at 1085.

## V.   CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment.

Dated:   8/16/13           _____

Jesus G. Bernal
United States District Judge

74